T.C. Memo. 1996-83


UNITED STATES TAX COURT


JAMES P. WHITMER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1135-95.          Filed February 26, 1996.


<u>Frederick M. Cuppy</u>, <u>Todd A. Etzler</u>, and <u>Edward L. Burke</u>,
for petitioner.

<u>Ronald T. Jordan</u>, for respondent.


     P guaranteed the obligation of M, his wholly owned
corporation, under M's contracts with I.  Pursuant to
these contracts, I paid advance commissions to M and
its agents for insurance policies that they sold, and
M had to repay these commissions if the policies lapsed
or were canceled.  After I terminated its business
relationship with P and M, I sued M for repayment of
advance commissions and loans.  P was named as a
co-defendant because he guaranteed the debt.  P and M
countersued for reasons that were essentially unrelated
to P's claim.  In settlement of the litigation, the

parties agreed to release all claims related to their business relationship, and P agreed to pay I $25,000. When the agreement was reached, M owed I $182,295. <u>Held</u>: P did not realize cancellation of debt income on account of the release.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>: James P. Whitmer petitioned the Court to redetermine respondent's determination with respect to his 1987 and 1988 Federal income taxes. For 1987, respondent determined a $76,005 deficiency, a $3,800 addition to tax under section 6653(a)(1)(A), and a $19,001 addition to tax under section 6661(a). Respondent also determined that petitioner was liable for an addition to tax under section 6653(a)(1)(B). For 1988, respondent determined a $17,257 deficiency and a $4,314 addition to tax under section 6661(a).

Following concessions, the only issue left for decision is whether petitioner realized cancellation of debt (COD) income in 1987, on account of a settlement of a judicial proceeding in which he was a party. We hold he did not. Unless otherwise stated, section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded to the nearest dollar.

FINDINGS OF FACT[1]

Petitioner resided in Chicago, Illinois, when he petitioned the Court. His business is insurance sales, and he has been in this business since 1969. Petitioner and his wife, Lucia A. Whitmer, filed a 1987 Form 1040, U.S. Individual Income Tax Return, using the status of "Married filing joint return". Although respondent's notice of deficiency for the 1987 taxable year was issued to both petitioner and Lucia A. Whitmer, Mrs. Whitmer did not petition the Court with respect thereto, and, accordingly, she is not a party here.

Petitioner formed a wholly owned corporation, Whitmer Agency, Inc. (Whitco), on or about September 16, 1974, to issue life and health insurance policies and annuities. Petitioner was Whitco's president, and, in that capacity, he entered into a "General Agent's Contract" (Agent's Contract) with ITT Life Insurance Corp. (ITT) on October 22, 1981. Petitioner personally guaranteed Whitco's performance under the Agent's Contract. Petitioner, in his capacity as Whitco's president, also entered into an "Advance Commission and Loan Agreement for General Agent" (Agreement) with ITT on November 19, 1981. Petitioner personally guaranteed Whitco's performance under the Agreement. The Agent's Contract and the Agreement authorized Whitco to solicit and

---

[1] Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated herein.

procure applications for life and health insurance and annuities on behalf of ITT.

Petitioner subsequently changed Whitco's name to Midwest Agencies, Inc. (Midwest). On or about July 29, 1982, petitioner, in his capacity as Midwest's president, entered into a "General Agent's Contract" and an "Advance Commission and Loan Agreement for General Agent" with ITT. This contract and agreement were identical to the Agent's Contract and the Agreement, and hereinafter will be referred to as such. Petitioner personally guaranteed Midwest's performance under the Agent's Contract and the Agreement.

Whitco and Midwest engaged agents, including petitioner, to sell insurance products on a commission basis. ITT's insurance products (e.g., life insurance policies) were among these products. Under the Agreement, ITT paid commissions to Midwest (and its predecessor Whitco) and its agents. When an agent sold a policy, he or she received from ITT a commission that approximated the total commissions that would be earned over the life of the policy (including renewals). The unearned portions of the commissions were considered loans. If the policy was later renewed, the commission on the renewal that would otherwise have gone to the agent was applied to reduce the advance (or unearned) commissions that were previously paid to the agent. If the policy lapsed or was canceled, the portion of the commissions remaining unearned on the policy was treated as a

liability of Midwest (or Whitco).[2]  ITT maintained accounts to document the advance commissions that it had paid to its agents, as well as to monitor the later events that would affect these commissions.

ITT, Midwest, and petitioner terminated their business relationship in July 1983.  On August 3, 1983, ITT filed suit against petitioner, Midwest, and Whitco (collectively referred to as Defendants), for repayment of advance commissions and loans (ITT litigation).  ITT alleged, in part, that Midwest owed ITT: (1) Approximately $237,000 in advance commissions, derived from policies which were under imminent threat of cancellation by the policyholders, (2) $32,068 with respect to two loans,[3] and (3) $100,000 in exemplary and punitive damages.  Petitioner was named as a defendant because he guaranteed all of Midwest's obligations to ITT.

In or about September 1983, the Defendants answered the complaint, generally denying each material allegation therein.  On or about July 23, 1984, the Defendants filed a counterclaim

_____

[2] Under the Agent's Contract and the Agreement, ITT could cancel its policies and refund the corresponding premiums, and Midwest would be liable for repayment of the unearned commissions on the premiums.

[3] On or about Nov. 11, 1982, Midwest had borrowed $4,700 from ITT, and on or about Feb. 9, 1983, Midwest had borrowed $30,000 from ITT.  The $4,700 loan was repayable (with interest) in 12 monthly payments of $413.20, the first payment due on Jan. 1, 1983.  The $30,000 was repayable (without interest) on demand, but the entire loan would be forgiven if Midwest met certain life and health insurance quotas.

against ITT for breach of contract, defamation of business reputation, and wrongful interference with business relationships. In relevant part, the counterclaim alleged that the Defendants had suffered: (1) $18 million in losses because they were terminated as general agent for ITT, (2) $7.5 million of compensatory damages and $30 million of punitive damages on account of defamatory statements published about them by ITT, (3) $30,000 of compensatory damages and $5 million of punitive damages because ITT had deceived the Defendants into signing the promissory notes underlying the $30,000 loan mentioned above, (4) $18 million of actual damages and $15 million of punitive damages because ITT had secretly met with many of the Defendants' employees and had persuaded the employees to terminate their employment with the Defendants, and (5) $18 million of actual damages and $15 million of punitive damages because ITT maliciously persuaded the Ohio Department of Insurance to investigate the Defendants and to refuse to transfer the Defendants' insurance licenses to other insurance companies.

On or about February 1, 1987, the parties to the ITT Litigation settled the litigation by signing an agreement of settlement and mutual release (Release). Under the Release, the parties agreed to release all claims arising or which could have arisen in the litigation, and petitioner agreed to pay ITT $25,000. Midwest had been dissolved in 1983, and petitioner was the only one of the Defendants from whom collection was feasible.

When the agreement was reached, Midwest owed ITT $182,295, which was attributable to the following:

| | |
|---|---|
| Commissions on refunded premiums or refundable commissions on lapsed policies | $151,469 |
| Unearned advance commissions | 826 |
| Loans | 30,000 |
| Total | $182,295 |

## OPINION

### 1. Preliminary Matter

At trial, the Court instructed each party's counsel to file briefs that adhered to the Tax Court Rules of Practice and Procedure. Petitioner has filed both an opening brief and an answering brief, as has respondent. Petitioner's opening brief does not comply with Rule 151(e), with respect to his proposed findings of fact. Whereas Rule 151(e)(3) states that "there shall be inserted references to the pages of the transcript or the exhibits or other sources relied upon to support * * * [a party's proposed findings of fact]", petitioner's brief does not refer us to the source of his proposed findings. At trial, the Court reminded each counsel of the need to file opening briefs containing references to the record to support proposed findings of fact, as well as answering briefs referencing objections to the other party's proposed findings.

In her answering brief, respondent objects to many of petitioner's proposed findings of fact as not being supported by evidence in the record. Because petitioner has made it virtually impossible for the Court to verify any of his proposed findings that were objected to by respondent, and because he has violated Rule 151(e)(3), the Court, in making its findings, has disregarded all of petitioner's proposed findings to which respondent has objected.[4] See Van Eck v. Commissioner, T.C. Memo. 1995-570. In the future, we admonish petitioner's counsel to adhere to our Rules of Practice and Procedure in matters before this Court.

## 2. Taxability of Proceeds

Respondent determined that ITT forgave $212,000 of a $237,000 debt that petitioner owed it, in return for a payment of $25,000. Thus, respondent determined, petitioner realized $212,000 of COD income, and he should have recognized this amount in 1987. Petitioner must prove respondent's determination

---

[4] We note, however, that our review of the record, taking into account the credibility of the witnesses, would not otherwise have allowed us to make findings in accordance with any of petitioner's proposed findings of fact to which respondent objected.

wrong.[5]  Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115
(1933).  Petitioner relies mainly on <u>N. Sobel, Inc. V.
Commissioner</u>, 40 B.T.A. 1263 (1939), and its progeny, and
contends on brief that he had no COD income in 1987 because the
$237,000 debt mentioned in the complaint was:  (1) Unenforceable
due to the fraudulent acts of ITT, (2) always subject to a bona
fide dispute, and (3) not liquidated until the settlement.
Petitioner's counsel stated in his opening statement that the
$25,000 payment referenced in the Release represented the actual
amount that Midwest owed ITT.

We agree with petitioner that he does not have COD income,
but we do so for different reasons.  It is hornbook law that
gross income includes income from the discharge of debt, and that
a taxpayer may realize COD income by paying an obligation at less
than its face value.[6]  Sec. 61(a)(12); <u>United States v. Kirby</u>

---

[5] Respondent introduced evidence at trial to establish the
amount of the debt that ITT forgave in the ITT Litigation.
Respondent concedes that this evidence shows that the debt
declined from $237,000 on the date of the complaint to $182,295
on the date of the Release.

[6] A cancellation of debt generally produces income to the
debtor in an amount equal to the difference between the amount
due on the obligation and the amount paid for the discharge.  If
no consideration is paid for the discharge, the entire amount of
the debt is usually considered the amount of income that must be
recognized by the debtor.  Sec. 61(a)(12); <u>Babin v. Commissioner</u>,
(continued...)

Lumber Co., 284 U.S. 1 (1931); see also Lehew v. Commissioner, T.C. Memo. 1987-389 (COD includes the relinquishment of a right to the repayment of advance insurance commissions or commissions related to refunded premiums). It does not naturally follow from this firmly established law, however, that a guarantor such as petitioner will always realize COD income on the discharge of a primary obligor's debt. We have found no case in which a guarantor such as petitioner realized COD income from a discharge of debt. In Kirby Lumber, the seminal case on COD income, the debtor was primarily liable for the debt.

Respondent relies on Bradford v. Commissioner, 233 F.2d 935 (6th Cir. 1956), revg. 22 T.C. 1057 (1954), and Tennessee Securities, Inc. v. Commissioner, 674 F.2d 570 (6th Cir. 1982), affg. T.C. Memo. 1978-434, to support her determination that petitioner realized COD income on the cancellation of Midwest's obligation to ITT. We do not read these cases to support respondent's determination, and she has not otherwise convinced us that the rationale of Kirby Lumber applies to the facts at hand. Midwest obtained a nontaxable increase in assets on account of its debt to ITT. Petitioner did not. To be sure,

_____

[6](...continued)
23 F.3d 1032, 1034 (6th Cir. 1994), affg. T.C. Memo. 1992-673.

petitioner intended as Midwest's sole shareholder to derive some benefit from the arrangement with ITT.  The hard fact remains, however, that the commissions and the loan proceeds that were the subject of the debt went to Midwest, and they did not go into petitioner's pocket.  ITT's forgiveness of its debt to Midwest also did not increase petitioner's net worth.  It merely prevented petitioner's net worth from being decreased.  Landreth v. Commissioner, 50 T.C. 803, 812-813 (1968).

Under the facts at hand, we hold that petitioner did not realize COD income on account of the Release.  In so holding, we have considered all arguments made by respondent for a contrary holding and, to the extent not discussed above, have found them to be without merit.[7]

To reflect the foregoing,

Decision will be entered under Rule 155.

---

[7] As an alternative to her main argument, respondent argues that petitioner received taxable damage income paid through a discharge of indebtedness in 1987.  According to respondent, petitioner's liability under his guarantee was reduced by nonexcludable amounts that he was entitled to receive on account of the Defendants' Counterclaim in the ITT litigation. Petitioner has moved the Court to place the burden of proof on respondent, with respect to this argument.  For reasons similar to above, we reject respondent's alternative argument.  We shall deem petitioner's motion to be moot.