# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

-------------------

m 01-40693

-------------------

JAMES MATHIS,

Plaintiffs,

JAMES MATHIS, MOHAMMED ABOU-HARB, GEORGE ACOSTA,
MUSA ADI, MAZEN ALLAHAM, ET AL.,

Plaintiffs-Appellees,

VERSUS

EXXON CORPORATION,

Defendant-Appellant.

-------------------

Appeals from the United States District Court
for the Southern District of Texas

-------------------

August 15, 2002

Before REAVLEY, SMITH, and DENNIS,
   Circuit Judges,

JERRY E. SMITH, Circuit Judge:

This is a breach of contract suit brought by fifty-four gasoline station franchisees against Exxon Corporation ("Exxon") for violating the Texas analogue of the Uniform Commercial Code's open price provision. We affirm.

I.

Exxon markets its commercial gas bound for retailers primarily through three arrangements: franchisee contracts, jobber contracts, and company operated retail stores ("CORS"). A franchisee rents Exxon-branded gas stations and enters into a sales contract for the purchase of Exxon-brand gas. The contract sets the monthly quantity of gas the franchisee must purchase and allows Exxon to set the price he must pay. The franchisee pays the

dealer tank wagon price ("DTW") and takes delivery of the gas at his station.

A jobber contract requires the purchaser to pay the "rack price," which usually is lower than the price charged to franchisees. There is no sale of gas to CORS by Exxon, because the stores are owned by Exxon and staffed by its employees. Instead, an intra-company accounting is recorded that is equivalent to the price charged franchisees in the same price zone.

All the plaintiff franchisees operate stations in the greater Houston, Texas, and Corpus Christi, Texas, areas. The genesis of the dispute is the allegation that Exxon has violated the law and its contracts with these franchisees for the purpose of converting their stores to CORS by driving the franchisees out of business.

Since 1994, franchisees have been barred from purchasing their gas from jobbers, so all their purchases have been governed by the terms of the Retail Motor Fuel Store Sales Agreement, under which the "DEALER agrees to buy and receive directly from EXXON all of the EXXON-branded gasoline bought by DEALER, and at least seventy-five percent (75%) of the volume shown in [a specified schedule]. . . . DEALER will pay EXXON for delivered products at EXXON's price in effect at the time of the loading of the delivery vehicle."

This "price in effect," also know as the dealer tank wagon price ("DTW"), forms the heart of the present dispute. Exxon claims this arrangement is the industry standard and that almost all franchisor-franchisee sales of gasoline are governed by a similar price term. Plaintiffs respond that the DTW price charged

under this clause is "consistently higher" than the rack price paid by jobbers plus transportation costs.[1]

---

[1] Neither side disputes that the price term in the sales agreement is an "open price term" under Texas law, because it is a "price to be fixed by the seller." TEX. BUS. & COM. CODE ANN. § 2.305 (Vernon 2002). In full, this provision reads:

(a) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if

(1) nothing is said as to price; or

(2) the price is left to be agreed by the parties and they fail to agree; or

(3) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

(b) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

(c) When a price left to be fixed otherwise than by agreement of the parties fails to be fixed through fault of one party the other may at his option treat the contract as cancelled or himself fix a reasonable price.

(d) Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract. In such a case the buyer must return any goods already received or if un-
(continued...)

2

The franchisees originally filed Sherman Act, Clayton, Act, and Petroleum Marketing Practices Act ("PMPA") claims against Exxon in addition to the breach of contract claim. The antitrust claims were abandoned, and the district court granted Exxon a judgment as a matter of law ("j.m.l.") on the PMPA claims. The court retained jurisdiction over the purely state law causes of action that had been supplemental to the federal claims.[2]

Trial proceeded solely on the Texas breach of contract action, with only six plaintiffs testifying. The thrust of their testimony was that Exxon had set the DTW price at an uncompetitive level to drive them out of business (so as to replace their stores with CORS). Some of the plaintiffs testified that their franchises were unprofitable; they presented documents and witnesses to show that Exxon intended that result to drive them out of business.

The franchisees also submitted a market study showing that 62% of the franchisees in Corpus Christi were selling gas below the DTW price. The franchisees supported their theory of the case by calling Barry Pulliam as an expert witness on the economics of the gasoline market in Houston and Corpus Christi. Pulliam concluded that Exxon's DTW price was not commercially reasonable from an eco-nomic perspective because it was a price that, over time, put the purchaser at a competitive disadvantage. Pulliam noted that "commercial reasonableness" is a legal term, and he was not there to define it for the jury.

Pulliam's conclusion rested on two main facts. First, he showed that 75% of the franchisee's competitors were able to purchase gasoline at a lower price. Second, he calculated a commercially reasonable DTW price by adding normal distribution charges to the average rack price of gasoline charged by Exxon and its competitors. He concluded that Exxon's DTW price exceeded the sum of these other prices by four or more cents per gallon.

Exxon countered with Michael Keeley, who testified that Exxon's DTW price was commercially reasonable because it reflected the company's investment in land, the store, transportation, and managers. Keeley explained that Exxon recovers these costs through rent and the sale of gas.

The jury awarded $5,723,657SSexactly 60% of the overcharge calculated by Pulliam. Plaintiffs moved for attorney's fees, as authorized by TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (Vernon 2002), supported by a five-paragraph affidavit of lead counsel and an expert's affidavit opining that the fees were reasonable. The court granted fees of $2,289,462 SS40% of the damages. Exxon raises three issues on appeal: (1) The court should have granted Exxon's motion for j.m.l. on the contract claim; (2) the court erred in permitting Pulliam to testify; and (3) the fee award was erroneous.

## II.

Exxon contends that because it charged its franchisees a DTW price comparable to that

[1](...continued)
able so to do must pay their reasonable value at the time of delivery and the seller must return any portion of the price paid on account.

TEX. BUS. & COM. CODE ANN. § 2.305 (Vernon 2002).

[2] This is proper under 28 U.S.C. § 1367(c)(3). *See also Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999).

charged by its competitors, the breach of contract claim is precluded as a matter of law. We review the denial of j.m.l. using the same standards employed by the district court. *Coffel v. Stryker Corp*, 284 F.3d 625, 630 (5th Cir. 2002). Although this is a state-law issue, the standard for granting j.m.l. is a question of federal law. *Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 336 (5th Cir. 2001).

A j.m.l. is appropriate where "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." FED. R. CIV. P. 50(a). We review the denial of j.m.l. *de novo*. *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 653 (5th Cir. 2002). We also review *de novo* a district court's application of state law. *Salve Regina College v. Russell*, 499 U.S. 225, 231 (1991).

Finally, we uphold a jury verdict if it is supported by evidence of the type and quality that fairly supports the verdict, even if the evidence would support other outcomes. *Gann v. Fruehauf Corp*, 52 F.3d 1320, 1326 (5th Cir. 1995). The question is whether there was evidence permitting the jury to conclude that Exxon breached a term of the franchise agreement.

### III.

Texas law, which tracks the Uniform Commercial Code, implies a good faith component in any contract with an open price term. Specifically,

> [t]he parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time of delivery . . . A price to be fixed by the seller or by the buyer means a price for

him to fix in good faith.

TEX. COM. & BUS. CODE ANN. § 2.305 (Vernon 2002). The parties agree that the franchise agreement term governing the purchase of gasoline is an open price term.

The meaning of "good faith" is further defined in several other sections of the code. The definitions section explains good faith as "honesty in fact in the conduct or transaction concerned." TEX. COM. & BUS. CODE ANN. § 1.201(19) (Vernon 2002). Wherever the term "good faith" is used throughout the code, it means "as least what is here stated." TEX. COM. & BUS. CODE ANN. § 1.201(19) cmt. 19 (Vernon 2002).

Additional meaning to the term may be added within a given article. *Id.* Section 2.103, regarding merchants, further explains the term: "Good faith" in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." TEX. COM. & BUS. CODE ANN. § 2.103 (Vernon 2002).[3] Finally, "[g]ood faith includes the observance of reasonable commercial standards of fair dealing in the

---

[3] Exxon meets the definition of a merchant.

"Merchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

TEX. COM. & BUS. CODE ANN. § 2.104(a) (Vernon 2002).

trade if the party is a merchant. (Section 2.103). But, in the normal case a 'posted price,' 'price in effect,' 'market price,' or the like satisfies the good faith requirement." TEX. COM. & BUS. CODE ANN. § 2.305 cmt. 3 (Vernon 2002).

The key disagreement is over what constitutes a breach of the duty of good faith. Exxon contends it has satisfied that duty because it has charged the plaintiffs a DTW price within the range of its competitors' DTW prices, thereby satisfying the "commercial reasonableness" meaning of good faith. Plaintiffs respond that good faith encompasses both objective and subjective duties. Even if Exxon is right, and its prices are within the range of its competitors', the argument runs, a subjective intent to drive the franchisees out of business would abridge the good faith duty of the open price term.

The pivotal provision is comment 3 to § 2.305. Some of the language of comment 3 and § 2.103 leaves the meaning of good faith for open price terms in doubt. Comment 3 mentions that good faith "includes" commercial reasonableness, but notes that certain established prices satisfy the good faith requirement. Section 2.103 defines good faith with the subjective "honesty in fact" test. Thus, plaintiffs argue that an open price set according to a fixed schedule is set in good faith only if there is no improper motive animating the price-setter. Exxon replies that comment 3 speaks directly to prices set by a fixed schedule and consecrates them as in good faith *per se*.

In the absence of comment 3, there is no doubt Exxon would be subject to both the subjective "honesty in fact" good faith of § 1.201(19) and the objective "commercial reasonableness" good faith of § 2.103.[4] The difficult question is whether comment 3 creates an exception to the normal principles of good faith governing the sale of goods.

No court in this circuit, and no Texas state court, has squarely addressed this question.[5]

---

[4] *See* TEX. COM. & BUS. CODE ANN. § 1.201(19) cmt. 19 (Vernon 2002) ("Good faith", whenever it is used in the Code, means at least what is here stated. In certain Articles . . . additional requirements are made applicable.); *Lenape Resources Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 571 (Tex. 1996) (recognizing that duty of good faith is a background principle); *see also* 2 RONALD A. ANDERSON, UNIFORM COMMERCIAL CODE § 1-203:1 (1996):

The Code employs two standards of good faith. Section 1-201(19) states the generally applicable "subjective" ("white heart and empty head") standard which concentrates on the actual state of mind of the party rather than on the state of mind a reasonable man would have had under the same circumstances. Thus, the section defines good faith as "honest in fact in the conduct or transaction concerned." In the case of merchants, however, or at least those merchants governed by Article 2 on Sales, an objective element is added to their good faith duties. Section 2-103(1)(b) provides that "'[g]ood faith' in the case of a merchant means honest in fact and the observance of reasonable commercial standards of fair dealing in the trade." This definition imposes a duty on merchants to meet good faith requirements that are measured both subjectively and objectively.

[5] In *ISP Mineral Prods., Inc.* v. *GS Roofing Prods. Co.*, 1999 WL 102818 (N.D. Tex. Feb. 22, 1999), the court denied a motion to dismiss be-
(continued...)

5

Fortunately, because the Texas open price provision replicates that of the UCC, we can seek guidance from other courts.[6]

To decide whether comment 3 creates an exception, we turn first to the text of the comment and the related sections of the Texas version of the UCC.[7] In full, comment 3 reads,

> Subsection (2), dealing with the situation where the price is to be fixed by one party rejects the uncommercial idea that an agreement that the seller may fix the price means that he may fix any price he may wish by the express qualification that the price so fixed must be fixed in good faith. Good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant. (Section 2-103). But in the normal case a "posted price" or a future seller's or buyer's "given price," "price in effect," "market price," or the like satisfies the good faith requirement.

TEX. COM. & BUS. CODE ANN. § 2.305 cmt. 3 (Vernon 2002).

The bare text offers little to resolve the question. First, the comment notes that good faith "includes" reasonable commercial standards. This implies that the good faith required of a merchant setting an open price term encompasses both objective and subjective elements. The comment also creates a good faith safe harbor for such merchants when they use various sorts of fixed prices. But this safe harbor is applicable only in the "normal case." This suggests the safe harbor is not absolute, but it does nothing to define what takes a case out of the safe harbor.

As we will explain, we conclude that the "normal case" of comment 3 is coextensive with a merchant's residual "honesty in fact" duty embodied in §§ 1.201(19) and 2.103. Thus, the comment embraces both the objective (commercial reasonableness) and subjective (honesty in fact) senses of good faith; objective good faith is satisfied by a "price in effect" as long as there is honesty in fact (a "normal case"). This conclusion finds support in three sources: the structure of the UCC, its legislative history, and the caselaw.

Reading comment 3 to embody two different meanings of "good faith" tracks the general structure of the UCC. Courts and commentators have recognized that the meaning of "good faith" is not uniform throughout the code.[8] The cases and commentary treat the

---

[5](...continued)
cause the intent of the parties regarding the price to be set in good faith, in accordance with industry practice, may have been breached. This analysis does not aid us in resolving the central question this caseSSwhether the good faith clause of § 2.305 includes a duty to act without an improper motive in setting the price.

[6] *See Pennzoil Co. v. FERC*, 789 F.2d 1128, 1142 (5th Cir. 1986) (recognizing that because all states except Louisiana have adopted the UCC, "variations between state law and general principles are likely to be few").

[7] *Comm'rs of Court Titus County v. Agan*, 940 S.W.2d 77, 80 (Tex. 1997) (holding that Texas follows plain meaning rule where text is unambiguous).

[8] *See Watseka First Nat'l Bank v. Ruda*, 552 N.E.2d 775, 778 (Ill. 1990) (explaining that meaning of "good faith" varies by article); Dennis M.
(continued...)

"good faith" found in article 1 as subjective and the good faith found only in article 2 as objective.[9] Thus, there is nothing inconsistent in comment 3's using "good faith" in both the objective and the subjective senses.

The history of comment 3 bolsters this conclusion.[10] Some drafters of the UCC worried that for the "great many industries where sales are not made at fixed prices," such as the steel industry, where "practically every contract" is made at "the seller's price in effect," if § 2-305 "is to apply . . . it means that in every case the seller is going to be in a lawsuit . . . or he could be, because there isn't any outside standard at all." PROCEEDINGS OF ENLARGED EDITORIAL BD. OF AM. LAW INST. (Sunday Morning Session, Jan. 28, 1951) (statement of Bernard Broeker). The drafters considered wholly exempting such contracts from § 2-305, or stating that for a price in effect, the only test is whether the merchant engaged in price discrimination. One drafter

explained that the steel industry wanted to make "clear that we do not have to establish that we are fixing reasonable prices, because that gets you into the rate of return of profit, whether you are using borrowed money, and all those questions." *Id.*

The committee responded to these worries with the current comment 3: "[I]n the normal case a 'posted price' or a future seller's or buyer's 'given price,' 'price in effect,' 'market price,' or the like satisfies the good faith requirement." The drafter's solution was to avoid objective good faith challenges to prices set by reference to some "price in effect," while preserving challenges to discriminatory pricing. *See Hearing Before the Enlarged Editorial Board January 27-29, 1951*, VI BUSINESS LAWYER 164, 186 (1951) (explaining this intent). Nothing in the proceedings leading to the addition of comment 3 suggests that the overall *subjective* good faith duty of §§ 1-201 and 2-103 was to be supplanted; the evidence is quite to the contrary.

The drafters ultimately rejected two suggested addendums to § 2-305:

> An agreement to the effect that the price shall be or be adjusted to, or be based upon, or determined by reference to the seller's going price, price in effect, regular price, market price, established price, or the like, at the time of the agreement or at any earlier or later time, is not an agreement to which this subsection is applicable.
>
> . . .
>
> An agreement such as this is an agreement under which the seller or the buyer does not have any burden of showing

---

[8](...continued)
Patterson, *Wittgenstein and the Code: A Theory of Good Faith Performance and Enforcement Under Article Nine*, 137 U. PA. L. REV. 335, 380-87 (1988) (tracing history of meaning of "good faith" and noting differences in meaning between articles 1 and 2).

[9] *First Nat'l Bank v. Lewco Sec. Co.*, 860 F.2d 1407 (7th Cir. 1988) (stating that good faith as used in article 1 is a subjective standard); *Martin Marietta Corp v. N.J. Nat'l Bank*, 612 F.2d 745, 751 (3d Cir. 1979) (noting that definition in article 1 is subjective, but that in article 2 is objective); Patterson, *supra*, at 381 (same).

[10] *See Bridgestone/Firestone, Inc. v. Glyn-Jones*, 878 S.W.2d 132, 133-34 (Tex. 1994) (authorizing use of legislative history where text is ambiguous).

anything other than that he has not singled out the particular other party for discrimination.

PROCEEDINGS OF ENLARGED EDITORIAL BD. (statement of Bernard Broeker). Both of these recommendations are more sweeping than is the language ultimately adopted. The first would have omitted any mention of the good faith duty for open price provisions; the second would have limited the duty of the price-setter to that of avoiding discrimination.

The existing comment, however, avoids challenges to prices set according to an open price term unless that challenge is outside the normal type of case. Although price discrimination was the type of aberrant case on the minds of the drafters, price discrimination is merely a subset of what constitutes such an aberrant case. Any lack of subjective, honesty-in-fact good faith is abnormal; price discrimination is only the most obvious way a price-setter acts in bad faithSSby treating similarly-situated buyers differently.

The caselaw supports this interpretation of comment 3. Courts that have addressed the normalcy question have consistently held that a lack of subjective good faith takes a challenge outside the bounds of what is normal.[11]

Like the plaintiffs in *Nanakuli, Allapattah, and Wayman*, the franchisees here are alleging a breach of good faith grounded not in Exxon's failure to price in accord with an established schedule, but in its failure to set the price in good faith. Suits recognizing such a cause of action are rare, and with good reason: We would be ill-advised to consider a case to be outside the norm based only on an allegation of improper motive by the party setting the price.[12]

Plaintiffs produced enough evidence to escape comment 3's "normal case" limitation. They showed, for example, that Exxon planned to replace a number of its franchises with CORS, that the DTW price was higher than the sum of the rack price and transportation, that Exxon prevented the franchisees from purchasing gas from jobbers after 1994, and that a number of franchisees were unprof-

---

[11] *See, e.g.*, *Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772, 806 (9th Cir. 1981) (stating that "the dispute here was not over the amount of the increaseSSthat is, the price that the seller fixedSSbut over the manner in which that increase was put into effect"); *Allapattah v. Exxon Corp.*, 61 F. Supp. 2d 1308, 1322 (S.D. Fla. 1999); ("Because the parties' dispute is not over the actual amount of the purchase price Exxon charged for its wholesale gasoline to its dealers, but rather over the manner in which the wholesale price (continued...)

[11](...continued) was calculated without considering the double charge for credit card processing, the instant action is not the 'normal' case."); *cf. Wayman v. Amoco Oil Co.*, 923 F. Supp 1322, 1349 (D. Kan. 1996), *aff'd*, 145 F.3d 1347 (10th Cir. 1998) ("[T]his court believes the present case is a normal case. If there was evidence that Amoco had, for example, engaged in discriminatory pricing or tried to run plaintiffs out of business, then the court's decision might be different.").

[12] *See Richard Short Oil Co. v. Texaco, Inc.*, 799 F.2d 415, 422 (8th Cir. 1986) (recognizing that "mere conclusory allegation of bad faith would be insufficient to defeat a directed verdict."); *cf. Wayman,* 923 F. Supp. at 1349 (acknowledging that result "may have been different" if there were evidence of an improper motive).

itable or non-competitive.[13]

For example, one Exxon document stated that the company's "Marketing Strategy for 1992-1997 is to reduce Dealer stores (est. 30%)." Another document set forth Exxon's plans to reduce dealer stations in Houston from 95 to 45, and to increase CORS from 83 to 150, between 1997 and 2003. James Carter, the Regional Director of the Exxon/Mobil Fuels Marketing Company, testified that Exxon made more of a profit from a CORS than from an independent lessee store. These plans and observations were validated by the fact that the number of dealer stations steadily declined.

An exhibit called the "Houston Screening Study" evaluated the strategy of "surplusing" (i.e., eliminating) 21 of 37 locations inside the Highway 610 loop. Of the 93 lessee-dealer stations, 69 would be done away with, but 73 of the 91 CORS would be kept.

Further indication of plans to shift from dealer-lessees to CORS is shown by Exxon's dissatisfaction with outlets featuring service bays. Exxon documents showed that service baysSSgenerally associated with lessee-dealer locationsSSwere becoming less profitable, while stations with convenience storesSSgenerally associated with CORSSSwere the wave of the future. A document entitled "Retail

Store Chain Outlook" revealed Exxon's plan to reduce stations with service bays from 2,506 to 190 from 1991 to 2005. That document included a plan to "[e]xpand CORS to improve profitability and to compete efficiently with private brands/distributors" and "[e]mphasize CORS operations in markets with high level of rack to retail competition.

Exxon's answer on appeal is that these documents "say nothing about *using pricing* to accomplish a 'plan' to eliminate dealers." Although that is so, there was sufficient evidence on this issue to go to the jury, which was free to, and apparently did, draw the inference connecting pricing to the elimination of dealer-lessees. The consequence of the jury's decision is that this case exceeds the "normal case" limit of § 2.305 comment 3.

We still, however, must examine the content of the duty of subjective good faith. Although no Texas or Fifth Circuit case has squarely addressed the meaning of the good faith clause of § 2.305, Texas courts repeatedly have held that the "honesty in fact" definition of good faith found in § 1.201(19) is tied to the actual belief of the participant in the transaction.[14] Thus, the same version of the facts accepted by the jurySSthat Exxon intended to drive the franchisees out of

---

[13] This case is distinguishable from *Meyer v. Amerada Hess*, 541 F. Supp. 321 (D.N.J. 1982), in which the court found "no evidence" of dishonesty in the setting of a DTW price. In *Meyer*, though, the only evidence tending to show bad faith was the retailer's unprofitability. *Id.* at 331. Significantly, other retailers were profiting, and the plaintiff retailer was being charged rent below the economic value of the property. *Id.* at 332.

[14] *La Sara Grain Co. v. First Nat'l Bank*, 673 S.W.2d 558, 563 (Tex. 1984); *Holeman v. Landmark Chevrolet Corp.*, 989 S.W.2d 395, 399 (Tex. App.SSHouston [14th Dist.] 1999, review denied); *British Caledonian Airways Ltd. v. First State Bank*, 819 F.2d 593, 596 (5th Cir. 1987); *see also Lenape Resources Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 571 (Tex. 1996) (noting in *dictum* that duty of good faith includes duty to avoid making decisions that, while legitimate under the terms of the contract, have improper motive).

businessSSthat takes this case out of the "normal" set of cases for purposes of comment 3 also satisfies the criteria for bad faith.[15]

Exxon's bad faith, in this regard, is shown by the record. Facing the competition of self-service stations that were either selling food and other goods or had bare pumps with no overhead costs incurred in servicing vehicles, Exxon decided years ago that retail marketing through franchise dealers was becoming economically unsound. Although Exxon decided to move to CORS in Houston and jobbers in Corpus Christi, this decision was not communicated to its franchisees. Because of profit from their other sales, CORS could, and did, sell gas for less than the franchise dealers paid to Exxon for their gas. And the jobbers delivered Exxon gas to their dealers for less than Exxon franchisees were required to pay for their delivered gas, but Exxon prohibited its franchisees from buying at this lower price from the jobbers.

The loss of competitive position and profit to plaintiff franchisees was inevitable and foreseeable to Exxon. Although Exxon witnesses denied receiving complaints, its dealers testified that they had complained often and for years, without success, until the very eve of trial.

Accordingly, the jury's finding that Exxon breached its duty of good faith in setting the DTW price it charged the plaintiffs is not without foundation in the law or the evidence. As we have recounted, plaintiffs offered ample evidence tending to prove their version of price-setting. Accordingly, there is no error in the refusal to grant Exxon j.m.l. on the breach of contract claim.

IV.

Exxon challenges the admission of the testimony of plaintiffs' expert, Barry Pulliam. Although Exxon filed a motion *in limine* opposing Pulliam's testimony, it did not object at trial. The pre-trial objection is sufficient to preserve the error for appellate review. FED. R. EVID. 103(a). Our review is thus for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 274 (5th Cir. 1998) (en banc).[16]

Although the substantive aspects of this case are governed by Texas law, the Federal Rules of Evidence control the admission of expert testimony. *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 459 (5th Cir. 1996). All expert testimony is filtered through FED. R. EVID. 702 and 104(a). FED. R. EVID. 702 advisory committee's note (2000 amendments); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147

---

[15] *See also Allapattah,* 61 F. Supp. 2d at 1322 (explaining that "a merchant [who] acts in a manner intended to drive a franchisee out of business" violates the duty of good faith found in the UCC). Similarly, one court has recognized that a "predatory intent" to "set the prices with the intent to drive [franchisees] out of business and take over the stations" is a claim cognizable under the good faith provisions of the UCC. *E.S. Bills, Inc. v. Tzucanow*, 700 P.2d 1280, 1283-84 (Cal. 1985).

[16] The 2000 amendment to rule 103(a) changed the law that had prevailed in this circuit. FED. R. EVID. 103(a); *See also United States v. McGauley*, 279 F.3d 62, 72 n.7 (1st Cir. 2002) (noting the change effected by the 2000 amendments). Before the amendment, we required an objection at trial to preserve the error. *See Rushing v. Kan. City S. Ry.*, 185 F.3d 496, 506 (5th Cir. 1999)*; Tanner v. Westbrook*, 174 F.3d 542, 545 (5th Cir. 1999); *Marceaux v. Conoco, Inc.*, 124 F.3d 730, 734 (5th Cir. 1997); *Collins v. Wayne Corp.*, 621 F.2d 777, 784 (5th Cir. 1980).

(1999).

Pulliam's testimony, as an economist, satisfies the definition of expert testimony. *Marcel v. Placid Oil Co.*, 11 F.3d 563, 567 (5th Cir. 1994). Whether he is qualified to testify as an expert is a question of law. FED. R. EVID. 104(a). The party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the rule 702 test. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

The district court did not offer any reasons in support of admitting Pulliam's testimony. Although a court "must articulate its basis for admitting expert testimony," *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 581 (5th Cir. 2001), we will not invariably require remand for this reason alone. Because admissibility is a legal questionSSone ill-suited to remand and further explication by the district courtSSwe will decide the question in this case without remanding.

Rule 702 lays out the test for admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. The requirement that the testimony "assist the trier of fact" means the evidence must be relevant. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). Rule 401 defines relevant evidence as that which has "any tendency to make any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401.

Pulliam's testimony centered on his calculation that Exxon's DTW price was at least four cents higher per gallon than what could be considered "commercially reasonable" by adding the rack price to transportation costs. This fact obviously makes more plausible plaintiffs' theory that Exxon set the DTW price with an intent to drive them out of business. There is no real contention regarding Pulliam's qualifications, as he has a master's degree in economics.

The final rule 702 hurdle is reliability, which is not a question that can be answered by some generic test. The variability of type and purpose of the particular testimony at issue requires flexibility in answering the reliability inquiry.[17] *Daubert*, of course, provides an illustrative list of factors that may aid a court in evaluating reliability: "(1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the

---

[17] *Kumho Tire*, 526 U.S. at 150 (emphasizing that *Daubert* analysis is "flexible" and must take account of "the nature of the issue, the expert's particular expertise, and the subject of his testimony").

technique or theory has been generally accepted in the scientific community." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) (en banc).

Pulliam's testimony primarily drew on general business and economic principles that satisfy the *Daubert* factors. Exxon argues, however, that Pulliam should have conducted a "competitive impact analysis" for each station to show that Exxon's price caused it to lose business. This, Exxon argues, would separate other factors from Exxon's pricing decision that may have depressed plaintiffs' business.

Although Pulliam may not have isolated the precise effect Exxon's pricing had on each station, that was not the purpose of his testimony. The "subject of his testimony," as listed by plaintiffs, was whether Exxon had set a commercially reasonable price in an economic sense. This, the plaintiffs thought, would lend credibility to their theory that Exxon had set the DTW price with the intent to drive them out of business. Thus, to be both reliable and relevant for the purpose it was presented to serve, Pulliam's testimony need not isolate the precise impact Exxon's pricing had on each station.

Exxon also attacks Pulliam's method of defining the relevant geographic market for each station. As Exxon rightly points out, Pulliam's method of drawing a three-mile radius around each station is not especially sophisticated and may ignore local traffic patterns.[18] Although

Pulliam's method may be rough-and-ready, it no doubt captures many of a station's competitors. At worst, it is marginally under- or over-inclusive.

Again, we must bear in mind the purpose of Pulliam's testimony when addressing its reliability. Pulliam main pointSSthat the price Exxon charged its franchisees exceeded the rack price plus transportationSSis unaffected by any error in defining the competitive market for each station. Also, the part of Pulliam's testimony as to which this objection may carry some weightSSthat seventy-five percent of plaintiff's competitors enjoyed a lower purchase price for gasolineSSis not completely undercut by an under- or over-inclusive definition of the relevant competitive market. Finally, this objectionSSthat certain proximate stations do not really compete with each otherSSis precisely the type of objection a juror can evaluate.

The *Daubert* analysis should not supplant trial on the merits. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002). "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id*. (quoting *Daubert* 509 U.S. at 596). We find no abuse of discretion in the decision to admit Pulliam's testimony.

V.

Exxon challenges the attorney's fee award of $2,289,462, arguing that the district court erred in finding this amount reasonable. A fee award is governed by the same law that serves

---

[18] As counsel for Exxon noted at oral argument, this method lumps stations in River Oaks and the Third Ward (locations in Houston) into the same market, and few drivers use stations in both

[18](...continued)
markets.

12

as the rule of decision for the substantive issues in the case. *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 614 (5th Cir. 2000). Until recently, we had reserved the question whether Texas or federal law governed review of an award's reasonableness. *See, e.g.*, *Mid-Continent Cas. Co. v. Chevron Pipe Line Co.*, 205 F.3d 222, 232 (5th Cir. 2000). Very recently, however, we applied Texas law to this question without noting any reservation of the question. *Northwinds Abatement, Inc. v. Employers Ins.*, 258 F.3d 345, 353-54 (5th Cir. 2001). We now make explicit what was implicit in *Northwinds*: State law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision. We review attorney's fees for abuse of discretion, although factual determinations for each of the factors are reviewed only for clear error. *Coffel v. Stryker Corp.*, 284 F.3d 625, 640 (5th Cir. 2002).

Under Texas law, when a prevailing party in a breach of contract suit seeks fees, an award of reasonable fees is mandatory, as long as there is proof of reasonable fees. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (Vernon 2002); *World Help v. Leisure Lifestyles*, 977 S.W.2d 662, 683 (Tex.App.SSFort Worth, 1998, review denied 1999), and the plaintiff has been awarded damages. *Green Int'l Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997). There is no question that plaintiffs prevailed on a breach of contract claim under Texas law and were awarded damages. There is, however, discretion to determine the amount of the fee. *World Help*, 977 S.W.2d at 683. This discretion is guided by two presumptions.

First, there is a rebuttable presumption of reasonableness for fees that are "usual" or "customary." TEX. CIV. PRAC. & REM. CODE

§ 38.003 (Vernon 2002). Second, where the fees are tried to the court, as they were in this case, the statute authorizes the judge to take judicial notice of the "usual and customary fees" and the contents of the case file. *Id*. at § 38.004. Texas courts have upheld fee awards using these presumptions where the attorneys had a contingent fee arrangement. *Laredo Indep. Sch. Dist. v. Trevino*, 25 S.W.3d 263 (Tex. App.SSSan Antonio 2000, review denied) (40% contingency fee)*; European Crossroads' Shopping Ctr., Ltd. v. Criswell*, 910 S.W.2d 45, 58-59 (Tex. App.SSDallas 1995, writ denied) (upholding jury award of 35% based only on attorney's own testimony).[19]

Plaintiffs' attorneys supported their fees by submitting an affidavit drafted by lead counsel and an affidavit of an attorneys' fees expert. Exxon countered by challenging the reasonableness of the total award. Under Texas law, the two affidavits, combined with the presumption of reasonableness and the court's ability to use judicial notice to guide the reasonableness finding is enough for us to conclude that the district court did not abuse its discretion in awarding fees as contemplated by plaintiffs' contingency fee contract.

AFFIRMED.

---

[19] *See also Gill Sav. Ass'n v. Chair King, Inc.*, 797 S.W.2d 31 (Tex. 1990) (using § 38.004 to reverse appeals court ruling that there was no evidence to support appellate fees) (no contingency fee).