# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 20, 2013

No. 11-11012

Lyle W. Cayce
Clerk

LIBERTY MUTUAL INSURANCE COMPANY,

> Plaintiff-Appellant
> Cross-Appellee.

versus

HISAW & ASSOCIATES GENERAL CONTRACTORS, INCORPORATED,

> Defendant-Appellee,

RICHARD L. HISAW; KATHRYN REHM-HISAW,

> Defendants-Appellees
> Cross-Appellants.

Appeals from the United States District Court
for the Northern District of Texas
(09-CV-867)

Before HIGGINBOTHAM, SMITH, and ELROD, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR.

(continued...)

No. 11-11012

Richard and Kathryn Hisaw own Hisaw & Associates General Contractors, Incorporated ("HAGC"). The Hisaws and HAGC entered into a surety agreement with Liberty Mutual Insurance Company ("Liberty Mutual") under which they indemnified Liberty Mutual and agreed not to make certain types of transfers of assets. After HAGC defaulted on its contracts, Liberty Mutual had to pay the bondholders and sought recovery from HAGC and the Hisaws, challenging several transfers and payments made by HAGC as invalid under the agreement. The district court granted summary judgment partially in favor of Liberty Mutual and partially in favor of the Hisaws and awarded attorney's fees to Liberty Mutual. We affirm in part, reverse in part, and vacate the fee award.

## I.

As part of the surety agreement, HAGC and the Hisaws indemnified Liberty Mutual for payment of bonds: HAGC and the Hisaws would be jointly and severally liable for "losses, fees, costs and expenses" incurred by Liberty Mutual as a result of the enforcement of a payment and performance bond. The agreement provided that

> [i]n the event of any payment by the Surety, the Principals and Indemnitors further agree that in any accounting between the Surety and [HAGC], or between the Surety and the [Hisaws], or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement.

The parties amended the agreement to protect Liberty Mutual further in case of enforcement of the bonds and to limit the Hisaws' individual exposure. The amendment stated that

---

<sup></sup> (...continued)
R. 47.5.4.

No. 11-11012

> [t]he joint and several liability of the [Hisaws] to the Surety under the General Agreement of Indemnity, shall be specifically limited to the full extent of any funds or assets of [HAGC] received by the [Hisaws] as a result of distributions, payments or dividends or bonuses, redemption of stock, loans, or sale of assets which reduce the TANGIBLE NET WORTH of [HAGC] below Three Million Dollars ($3,000,000); or which occur while [HAGC's] Tangible Net Worth is below Three Million Dollars ($3,000,000).

The corollary provision forbade HAGC from making distributions, payments, and the like when its assets fall below $3 million or when doing so would cause its assets to follow below that threshold.

After execution of the agreement and amendment, owners of bonds enforced their rights against Liberty Mutual, which claimed losses of $16,278,896. The Hisaws and HAGC then took several actions that Liberty Mutual argues violated the amendment.

First, HAGC repaid a $585,000 loan that the Hisaws had given to HAGC. Second, HAGC paid down a $501,222.22 line of credit for which Richard Hisaw was a personal guarantor. Third, HAGC paid $131,214 in rent to its landlord, Two Chilies Holding ("Two Chilies"), a corporation owned by the Hisaws. Fourth, HAGC paid $10,675 to wind up a 401(k) retirement account. Fifth, HAGC paid a retainer of $321,865.80 to counsel who subsequently represented HAGC and the Hisaws in this matter. Sixth, the Hisaws paid $532,134 to HAGC for operating expenses. Seventh, HAGC paid $18,519 in operating expenses. Finally, HAGC paid $152,300 to ADP Payroll to pay employee salaries, including $45,000 to the Hisaws. Liberty Mutual contended that these payments occurred after HAGC's assets were under the $3 million threshold and were therefore prohibited under the amended agreement.

In the district court, Liberty Mutual argued that each of the payments was either a distribution, payment, or the "result of" a loan and was "received by" the Hisaws, and therefore, under the amendment, the Hisaws were liable for the

No. 11-11012

amount of those transfers. Based on the plain meaning of "loan" and the text of the indemnity agreement taken as a whole, the court concluded that "loans" meant loans from HAGC to the Hisaws. The court therefore held that the repayment by HAGC of the loan from the Hisaws was not a distribution as a result of a loan as contemplated by the indemnity agreement. It denied Liberty Mutual's motion for summary judgment and granted the Hisaws' motion for summary judgment as to the loan repayment.

The court also determined that payments under the indemnity agreement and amendment did not include transfers to third parties from which the Hisaws or HAGC "merely derive[d] [indirect] personal benefit." The court concluded that the repayment of the line of credit, the rental payments, the 401(k) payments, and the payments to attorneys were not "received by" the Hisaws. The court therefore denied Liberty Mutual's motion for summary judgment and granted the Hisaws' motion on these claims as well. The court similarly denied Liberty Mutual's motion for summary judgment and granted the Hisaws' as to the operating expense payments and salaries, except that it held that the salary paid by HAGC to the Hisaws was a distribution, and so it granted summary judgment in that amount to Liberty Mutual. A subset of these summary-judgment rulings forms the basis of this appeal.[1]

Finally, the court awarded Liberty Mutual attorney's fees of $354,349 to be paid by HAGC and the Hisaws. The Hisaws objected to that award as unreasonable; because Liberty Mutual had recovered only $45,000, a fraction of what it sought, such high fees were excessive. The court agreed that the fee was unreasonable and reduced it by 50%.

II.

---

[1] The court also granted summary judgment against HAGC for losses sustained by Liberty Mutual and dismissed a number of contract claims. None of those is appealed.

4

No. 11-11012

Summary judgments are reviewed *de novo*. *See Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 213 (5th Cir. 1999). Summary judgment is appropriate where, taking the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). *See also* FED. R. CIV. P. 56(a). We apply Texas law to interpret the disputed contract. *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 309–310 (5th Cir. 2010).

Awards of attorney's fees are reviewed for abuse of discretion. *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002). A court "'abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence.'" *United States v. Ebron*, 683 F.3d 105, 125 (5th Cir. 2012) (quoting *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008). "State law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision." *Mathis*, 302 F.3d at 461.

III.

Under Texas law, we "must give [a contract's] words their plain meaning, without inserting additional provisions into the contract." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Crocker*, 246 S.W.3d 603, 606 (Tex. 2008) (citations omitted). We must also strive to "ascertain and give effect to the intent of the parties as that intent is expressed in the contract." *Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) (citations omitted). The intent inquiry, however, is an objective one, and it is subject to the plain meaning of the words in the contract. "In the usual case, the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent

5

No. 11-11012

that controls."[2]

Liberty Mutual appeals the holdings regarding the rent payment, the repayment of the line of credit, the law-firm retainer payment, and the loan repayment. The Hisaws appeal the holding that their salary constituted a "distribution" and the attorney's fees.

Liberty Mutual argues that the rent payment made by HAGC to Two Chilies was a fund or asset of HAGC "received by" the Hisaws as a result of a payment in direct contravention of the amended indemnity agreement. The Hisaws respond that they did not "receive" the payment; it was instead received by Two Chilies. The district court concluded that a payment to a third party was not an asset or fund "received by" the Hisaws.

The plain language of the contract prohibits the Hisaws from receiving funds or assets from HAGC as a result of payments or distributions. The Hisaws did not receive any funds from HAGC; instead, Two Chilies, a corporate entity distinct from the Hisaws, received them.

Liberty Mutual urges us to give the contract a "common sense" meaning to include transfers to third parties that might benefit the Hisaws. It argues that a transfer to a corporate entity owned by the Hisaws is the same as a transfer to them. Finding otherwise, Liberty Mutual asserts, would lead to "absurd" results. We reject this argument.

Liberty Mutual does not argue that the rental payment was a sham transaction or that the Hisaws in any way undermined the separate corporate identity of HAGC or Two Chilies. Though Liberty Mutual is correct that we avoid absurd results, this outcome is not that. If Liberty Mutual wanted to prevent transfers to third parties, owned by the Hisaws or not, it could have written such

---

[2] *Matagorda Cnty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) ("The Courts will give effect to the intention of the parties as expressed or as is apparent in the writing." (citation omitted)).

a provision into the contract. Under Texas law, "[a]n unambiguous contract will be enforced as written." *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (citation omitted). We may not write new restrictions into contracts. Because the rent payment was not "received by" the Hisaws but rather by Two Chilies, it does not violate the amended indemnity agreement.

Similar reasoning applies to the repayment by HAGC of a line of credit for which Richard Hisaw was a personal guarantor. Liberty Mutual argues that Richard Hisaw benefited from HAGC's repayment of the line of credit as if he had been given the money directly. This indirect benefit, discharge of potential liability, Liberty Mutual reasons, constitutes an asset effectively "received by" the Hisaws. Liberty Mutual once again asks us impermissibly to insert a provision into the contract. The money used to repay the line of credit did not go to the Hisaws but to HAGC's creditors. The fact that Richard Hisaw was a guarantor is immaterial; he received no funds or assets from HAGC as required under the agreement.[3] This transfer thus did not violate the contract.

We again apply the same understanding of funds or assets "received by" the Hisaws to HAGC's payment of a retainer to a law firm to represent it and the Hisaws. Liberty Mutual contends that the retainer was essentially the Hisaws' using HAGC's funds to purchase services for themselves, such that they were "receiving" those funds. We disagree.

The retainer was a legitimate transfer by HAGC to a law firm. Though the Hisaws undoubtedly benefited from the firm's dual representation of them and HAGC, they did not "receive" funds or assets from HAGC via a "payment" or "distribution." The plain meaning of receiving funds or assets does not include receiving benefits form a third party as a result of a business decision by

---

[3] This conclusion is further bolstered by analogy to federal tax law. A guarantor who is released by the principal's repayment has not realized cancellation of debt income for tax purposes. *See Whitmer v. Comm'r*, 71 T.C.M. (CCH) 2213 (T.C. 1996).

No. 11-11012

HAGC. Again, the contract could have been worded otherwise. The retainer payment did not violate the amended indemnity agreement.

Liberty Mutual argues that HAGC's repayment of loans that had been extended to it by the Hisaws were funds or assets received by the Hisaws "as a result of . . . loans." It suggests that this is the exact type of receipt of funds contemplated by the agreement. It is irrelevant, it maintains, that the loan was given to HAGC rather than to the Hisaws.

Liberty Mutual's understanding of "as a result of," however, is implausible. We "must construe contracts as a whole." *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005) (citation omitted). The language "as a result of" precedes a list of kinds of transfers, all of which necessarily flow to the Hisaws rather than from them. For example, the Hisaws may not receive HAGC funds "as a result of" stocks, bonuses, and distributions. These three types of transfers would flow from HAGC to the Hisaws.

The challenged loans, however, flowed from the Hisaws to HAGC, which was not giving them loans as it would give distributions or bonuses. The loan repayment is thus outside the scope of the other types of transfers. In the context of the agreement, loans meant loan transfers to the Hisaws rather than repayment of loans given by the Hisaws. Liberty Mutual's overly broad interpretation of "as a result of . . . loans" just does not fit.

Moreover, Liberty Mutual all but admitted that it understood "as a result of" loans to mean that loans could not be given by HAGC to the Hisaws. During his deposition, the senior surety counsel at Liberty Mutual testified that he interpreted loans under the indemnity agreement as "loans made by the principal to the individual indemnitors." After that statement, counsel for Liberty Mutual asked for a break in the deposition, and, after consultation, the witness explained that he had been confused and was "senile." He changed his testimony somewhat and said that loans could mean either loans to or from the

8

No. 11-11012

Hisaws. We find the original explanation persuasive and the retraction telling.

Finally, Liberty Mutual's overly broad understanding of "as a result of" would lead to absurd results. For example, if HAGC took out a loan to pay the Hisaws' salary, that payment would be "a result of" loans. Such an outcome is not contemplated by the agreement's plain meaning. We therefore reject Liberty Mutual's theory, and we agree with the district court that HAGC's loan repayments to the Hisaws were not prohibited by the amended agreement.

The final challenged transfer is the $45,000 salary to the Hisaws. The district court found that the payment constituted a "distribution" received by them and thus violated the agreement. The Hisaws, as cross-appellants, argue that this was not a "distribution." They cite to the technical definition of distribution as a dividend, redemption of shares or stock, or a payment as a result of a liquidation. *See* TEX. BUS. ORGS. CODE § 21.002(6)(a). They also point out that, on numerous occasions, Liberty Mutual's counsel asserted that salaries are not distributions and were not contemplated as such in the indemnity agreement.

Reading the contract as a whole, we agree with the Hisaws. The word distribution is a term of art, defined as a "corporation's direct or indirect transfer of money or other property, or incurring of indebtedness to or for the benefit of its shareholders, such as a dividend payment out of current or past earnings." BLACK'S LAW DICTIONARY 543 (9th ed. 2009). A salary, as distinguished from a distribution, is "[a]n agreed compensation for services—esp[ecially] professional or semiprofessional services—usu[ally] paid at regular intervals on a yearly basis." *Id.* at 1454. The $45,000 payment was not a transfer "to or for the benefit of [ ] shareholders" but instead was made as a part of a number of salary payments to employees of HAGC by HAGC's payroll vendor, ADP Payroll. It constituted a salary, paid to the Hisaws for their work as employees of HAGC, which is distinct from a distribution.

If we were to give "distribution" as broad a meaning as did the district

9

court, it would include essentially any type of transfer to the Hisaws. Giving it that broad meaning would render the rest of the amendment superfluous. "Distribution" would swallow "payments or dividends or bonuses, redemption of stock, loans, [and] sale[s] of assets." Under Texas law, all of a contract's provisions must be given effect "so that none are rendered meaningless." *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002) (citation omitted). We thus interpret "distribution" narrowly in conjunction with its common legal meaning and reverse the district court's contrary holding.

The court awarded attorney's fees under Section 38.001 of the Texas Civil Practice and Remedies Code, which provides that "[a] person may recover reasonable attorney's fees . . . if the claim is for: . . . an oral or written contract." To recover fees, "a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages."[4] Where zero damages are awarded, the party is not entitled to fees. *Green,* 951 S.W.2d at 390. Because we reverse on the issue of salary payments, Liberty Mutual has not prevailed on any cause of action, so it cannot recover attorney's fees under Texas law. We vacate the award.

In summary, the judgment is AFFIRMED as to the payment of rent, payment of the line of credit, payment of a retainer, and repayment of loans and is REVERSED as to the payment of salaries; the award of attorney's fees is VACATED. Judgment is RENDERED accordingly.

---

[4] *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997) (citing *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 437 (Tex. 1995)).