Affirmed in Part and Reversed and Remanded in Part and Opinion filed
February 13, 2003









Affirmed in Part and Reversed and Remanded in Part and Opinion filed
February 13, 2003.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-01-00597-CV

____________

 

HRN, INC., et al.,[1]
Appellants

 

V.

 

SHELL OIL COMPANY, MOTIVA
ENTERPRISES, L.L.C., EQUILON ENTERPRISES, L.L.C.,

AND EQUIVA SERVICES,
L.L.C., Appellees

 



 

On Appeal from the 234th District Court

Harris County, Texas

Trial Court Cause No. 99-28202

 



 

O P I N I O N








Appellants, several hundred lessee dealers operatingCor formerly operatingCShell service stations in seventeen
states (collectively “the dealers”), brought suit against Shell Oil Company,
Motiva Enterprises, L.L.C., Equilon Enterprises, L.L.C., and Equiva Services,
L.L.C. (collectively AShell@), alleging various causes of action arising out of their
business relationships with Shell.  Among
their complaints, the dealers alleged that Shell violated the duty of good
faith and fair dealing in setting the price the dealers were contractually
required to pay for gasoline.  The
dealers charged that Shell=s actions were intended to drive them out of business so that
Shell could replace the dealers with more profitable company-owned or
independently operated stations.  The
parties engaged in extensive briefing and argument on discovery disputes, the
merits, and related issues and, over the course of the proceedings, the trial
court entered numerous orders in response to the parties’ motions.  The case was ultimately disposed of by
summary judgment.  The dealers now appeal
from sixteen of the trial court’s orders. 
Because we find that the trial court erred in granting summary judgment
on the dealers= pricing claim, we affirm in part,
reverse in part, and remand in part.

I.          PROCEDURAL
BACKGROUND

The dealers originally brought suit alleging various state
common law and statutory claims, including breach of contract, antitrust
violations, negligence, fraud, and tortious interference with contract.  The live pleading, the tenth amended
petition, narrowed the claims to breach of contract and tort claims.  In two orders, the trial court rendered
summary judgment on all claimsCthe first on June 13, 2000, and the second on December 14,
2000.  The June 13 order also granted
summary judgment dismissing certain dealers’ claims based on releases they
signed.  At various times during the
pendency of the case, other dealers were dismissed for failing to respond fully
to discovery; some were later reinstated. 

Before final summary judgment was granted, the dealers moved
to compel discovery from Shell on several occasions.  They also moved several times for
continuances based on their asserted need for additional discovery.  The trial court denied most of the requests
for discovery, and denied all motions for continuances except one.  Following the entry of the final summary
judgment disposing of the dealers’ remaining claims, the dealers appealed.

II.        FACTUAL
BACKGROUND








Shell is a major refiner and marketer
of gasoline that distributes and markets its gasoline through both a retail and
a wholesale network of distributors. Shell=s retail network includes lessee
dealers such as appellants, who lease their gasoline stations from Shell and
purchase gasoline from Shell for resale to the public.  Shell also distributes gasoline directly to
the public through company-operated stations and contractor-operated stations
that do not have separate supply contracts with Shell for gasoline.  In major metropolitan areas, Shell may use a
combination of these enterprises to market Shell-branded gasoline to retail
customers.

In metropolitan fringe areas and rural areas, Shell
distributes gasoline primarily through its wholesale distributors, commonly
known as “jobbers.”  Jobbers develop and
often own their own service stations, and operate fleets of trucks to pick up
gasoline at refiners= terminals.  Jobbers
may have distribution agreements with several refiners simultaneously.  They pay a JTP (“jobber terminal price”) on
the gasoline they pick up from Shell’s terminals.  The JTP is traditionally termed the “rack
price.” 

A.        The Dealers’ Contractual Relationship with
Shell

Shell=s relationship with its lessee dealers is governed by two
agreements:  (1) a lease, under which
Shell leases the station to the dealer for a monthly rental fee; and (2) a
dealer agreement, under which each lessee dealer agrees to buy gasoline at the “dealer
prices for the respective grades and brands delivered in effect at the time loading
commences at the Plant and for the place of delivery.”  Shell=s dealer price is referred to as the
DTW (“dealer tank wagon”) price because it includes delivery to the dealer=s station by Shell tanker truck.  

B.        The DTW








Shell determines the DTW prices the dealers pay, and
prohibits the dealers from selling any gasoline except Shell-branded
gasoline.  According to the dealers, they
are also prohibited from purchasing their gasoline from jobbers because of a
strong disincentive in the jobbers= contracts with Shell, effectively
rendering them “captive buyers” of gasoline directly from Shell.[2]  Further, the dealers contend that the DTW was
unreasonably high.  According to the
dealers= experts, 73B80% of the gasoline sold in the
Houston area was sold through stations that were able to purchase gasoline at
prices lower than the DTW prices Shell charged its lessee dealers during the
period of 1995B1999. 
That was because, the experts explained, the majority of Houston gas
retailers= acquisition costs were based on rack
prices, which were lower than Shell=s DTW prices to dealers.  Several dealers complained that the retail
gas prices offered to the public by competing company-owned and jobber Shell
stations were lower than the DTW prices Shell charged them.  As a result of the unreasonably high DTW
prices, the dealers contend, they were unable to price their gas competitively
and were being forced out of business. 
The dealers alleged that Shell intentionally sought to drive the dealers
out of business so that it could concentrate on more profitable distribution
channels.

C.        The VRP

In May of 1982, Shell instituted a voluntary program known as
the “Variable Rent Program” or VRP. 
Under the VRP, if a lessee dealer sold an amount of gas over a specified
minimum, the DTW would be discounted by several cents per gallon and the
discount would appear as a reduction in the next month’s rent under the
lease.  Shell offered the VRP to its
dealers as an opportunity to reduce their rent costs based upon gasoline volume
increases at their stations.  However,
the appellants charge that any savings was illusory because Shell included a
rent component in the DTW pricing designed to offset any rent reductions.  Appellants further charge that Shell and its
territory representatives fraudulently concealed from the dealers the
connection between their rent and their DTW prices.  The VRP program was cancelled as of April 1,
1998.








III.       ISSUES ON
APPEAL

On appeal, the dealers raise five issues.  The first issue is a general assignment of
error based on the trial court=s grant of summary judgment. 
The second issue challenges the trial court=s grant of summary judgment on the
ground that Shell set its DTW in good faith and thus did not breach the open
price term of the dealer agreements.  In
the third issue, the dealers contend the trial court erred in granting summary
judgment against certain dealers on the grounds that they signed valid
releases.  In issue four, the dealers
contend the trial court abused its discretion in denying the discovery and
continuances the dealers requested.  The
fifth issue challenges the trial court=s dismissal of certain dealers for
failure to respond to discovery.  In
response, Shell contends that certain dealers or their stations were omitted
from the last live pleading, resulting in the waiver of their claims.

A.        Alleged Error in Granting Summary Judgment

We begin with two issues: 
the dealers= claim that the trial court wrongly entered summary judgment
on their pricing claim and Shell=s affirmative defense of
release.  

In their first three issues, the dealers challenge only the
dismissal of their claims based on the open price term and the releases.  Shell filed both a traditional and a
no-evidence motion for partial summary judgment on the dealers= claim that Shell did not set its DTW
in good faith.  On its own affirmative
defenses, including the affirmative defense of release, Shell filed only a
traditional summary judgment motion.  

1.         Standard of Review








In a traditional motion for summary judgment, the movant has
the burden of showing, with competent proof, that no genuine issue of material
fact exists, and that it is entitled to judgment as a matter of law.  Nixon v. Mr. Property Mgmt. Co., 690
S.W.2d 546, 548 (Tex. 1985); Tex. R.
Civ. P. 166a(c).  When a defendant
is the movant for summary judgment, it has the burden to conclusively negate at
least one essential element of the plaintiff's cause of action, or conclusively
establish each element of an affirmative defense.  Science Spectrum, Inc. v. Martinez, 941
S.W.2d 910, 911 (Tex. 1997).  If the
movant=s motion and summary judgment proof
facially establish its right to judgment as a matter of law, the burden shifts
to the non‑movant to raise a material fact issue sufficient to defeat
summary judgment.  City of Houston v.
Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979).  In deciding whether a disputed material fact
issue exists precluding summary judgment, we resolve every reasonable inference
in favor of the non‑movant and take all evidence favorable to it as true.
 Science Spectrum, 941 S.W.2d at
911; Nixon, 690 S.W.2d at 548B49. 

The rules for a no-evidence motion for summary judgment also
are well-known.  The movant must show
that (1) there is a complete absence of proof of a vital fact; (2) the court is
barred by rules of law or evidence from giving weight to the only evidence offered
to prove a vital fact; (3) the evidence offered to prove a vital fact is no
more than a scintilla; or (4) the evidence conclusively establishes the
opposite of a vital fact.  Blan v. Ali,
7 S.W.3d 741, 747 (Tex. App.CHouston [14th Dist.] 1999, no pet.).  In considering a “no evidence” summary
judgment, we review the proof in the light most favorable to the non‑movant
and disregard all contrary proof and inferences.  Id. 
If the non‑movants= proof rises to a level that would enable reasonable and fair
minded people to differ in their conclusions, then they have presented more
than a scintilla.  Id.  

2.         Good Faith
and the Open Price Term








In their tenth amended petition, the dealers alleged that the
pricing provision in the dealer agreements was an “open price term” that
obligated Shell to set the DTW price for gasoline in good faith, and that Shell
breached this contractual obligation. 
This claim is based on the good faith provisions of the Uniform
Commercial Code, which have been incorporated into the Texas Business and
Commerce Code.  See Tex. Bus. & Com. Code Ann. '' 1.101B11.108 (Vernon 1994).  In particular, section 2.305 of the Code,[3]
which governs open price terms, imposes the requirement that “[a] price to be
fixed by the seller or by the buyer means a price for him to fix in good faith.”  See Tex.
Bus. & Com. Code Ann. ' 2.305(b).








Here, it is undisputed that the DTW pricing provision is an “open
price term” governed by section 2.305(b) of the Code.  Instead, the dispute centers on what
constitutes a breach of the duty of good faith. 
The dealers contend that determining whether an open price term was set
in good faith is a fact-intensive inquiry not appropriate for summary judgment.  See Allapattah Servs., Inc. v. Exxon Corp.,
61 F. Supp. 2d 1308, 1324 (S.D. Fl. 1999) (holding that the parties’ intentions
in setting an open price term and the reasonableness of an open price term are
questions for the trier of fact).  They
also contend that they have raised fact issues on the following, all of which
relate to good faith: (1) the dealers were “captive buyers”; (2) the DTW was
unreasonably high and uncompetitive; (3) any savings obtained through the VRP
was added to the DTW; (4) Shell intended to eliminate dealers from its
distribution system; and (5) the dealers have experienced decreasing gas sales
and declining business, and some have been forced out of business.  Shell responds that it conclusively
demonstrated good faith because it was undisputed that its DTW prices were
within the range of DTW prices charged by other major oil companies in the
relevant markets.

a.         The
Definition of Good Faith

The duty of good faith is defined several places in the
Code.  “Good faith” is defined generally
as “honesty in fact in the conduct or transaction concerned.”  Id. ' 1.201(19).  In the case of a merchant, the Code provides
that good faith “means honesty in fact and the observance of reasonable
commercial standards of fair dealing in the trade.”  Tex.
Bus. & Com. Code Ann. ' 2.103(a)(2).  Shell does not dispute that it is a merchant
as that term is used in the Code.[4]


Additionally, Official Comment 3 to section 2.305 provides
the following guidance:

Subsection (2), dealing with the situation where the
price is to be fixed by one party rejects the uncommercial idea that an
agreement that the seller may fix the price means that he may fix any price he
may wish by the express qualification that the price so fixed must be fixed in
good faith.  Good faith includes
observance of reasonable commercial standards of fair dealing in the trade if
the party is a merchant.  (Section 2‑103).  But in the normal case a “posted price” or a
future seller=s or buyer=s “given
price,” “price in effect,” “market price,” or the like satisfies the good faith
requirement.

Tex. Bus. & Com. Code Ann. ' 2.305 cmt. 3.[5]  








b.         The Normal
Case: Good Faith Presumptively Satisfied

The gravamen of the parties= dispute is whether this case
constitutes a “normal case” in which the good faith requirement is
presumptively satisfied, as Shell urges, or whether, as the dealers allege,
numerous issues of fact render this case abnormal and preclude summary judgment
in favor of Shell.

While no Texas state court has addressed this issue in a
similar context, Shell directs us to courts in other states that have construed
comment 3 as creating a presumption that a Aprice in effect@ or “posted price” was set in good
faith.  See, e.g., Richard Short Oil
Co., Inc. v. Texaco, Inc., 799 F.2d 415, 422 (8th Cir. 1986) (holding that
Texaco=s “posted price” to distributors
satisfied the good faith requirement of Section 2B305(2) without more); Wayman v.
Amoco Oil Co., 923 F. Supp. 1322, 1350 (D. Kan. 1996), aff’d
mem., 145 F.3d 1347 (10th Cir. 1998) (holding that Amoco=s “price in effect” to lessee dealers
satisfied Section 2B305(2)=s good faith requirement). 
The Wayman court stated that comment 3 “reflects a belief that ' 2.305(2) should not require
suppliers in industries where ‘price in effect’-type contracts are often used
to establish that the price ultimately charged was a reasonable one.”  Wayman, 923 F. Supp. at 1346.  








Relying on Wayman, Shell argues that the comment
demonstrates that section 2.305 was intended to address only claims of
discriminatory pricing among buyers with identical pricing provisions.  See id. at 1346B47. 
Only discriminatory pricing would take a price out of the “normal case”
in which the pricing was presumed to be set in good faith.  Shell contends its DTW price is a “posted
price.”  And since the dealers are not
alleging discriminatory pricing, Shell claims it was entitled to summary
judgment on the pricing claim.  Moreover,
Shell asserts, it conclusively demonstrated that its prices were “commercially
reasonable” because they were within the range of DTW prices charged by other
major oil companies in the relevant markets. 
Phrased another way, Shell=s claim essentially is that a posted
price within the range of DTW prices of other major oil companies cannot be
considered an abnormal case. 

c.         Mathis:
Subjective Good Faith and the “Abnormal Case”

However, the Fifth Circuit has disagreed with Wayman
and the reasoning that Shell proposes. 
In the recent case of Mathis v. Exxon Corp., 302 F.3d 448 (5th
Cir. 2002), which involved nearly identical facts and issues to this case, the
Fifth Circuit reviewed a jury verdict that Exxon breached its agreement with
its franchisees because it set its DTW in bad faith.  Like Shell, Exxon contended that the breach
of contract claim under section 2.305 of the Code was precluded as a matter of
law because it charged its franchisees a DTW price comparable to that charged  by its competitors.  

To determine what constitutes a breach of the duty of good
faith under section 2.305 of the Code and to determine if comment 3
contemplates both an objective and subjective component of good faith, the Mathis
court undertook a detailed analysis of the term “good faith” as used in various
sections of the Code.[6]  Id. at 453B56. 
It determined that the Code employs two standards of good faithCone
objective, which incorporates the thought that a merchant must observe
reasonable commercial standards of fair dealingCand one subjectiveCwhich incorporates a requirement that
the merchant act with an honest intent or with “honesty in fact.”  The court also concluded that comment 3
incorporated both of those standards.[7]  Id. at 454 n.4.  Having made these conclusions, the ultimate
question for the court regarding comment 3 became what constituted an abnormal
case, and specifically, whether discriminatory pricing was the only abnormal case.  Id. at 455B456. 








The court concluded that, although price discrimination was
specifically listed in the comment as being abnormal, it was listed, not as
being exhaustive of what constitutes an aberrant open price case, but merely as
a “subset of what constitutes an aberrant case.”  Id. at 457.

Any lack of subjective honesty-in-fact good faith is
abnormal; price discrimination is only the most obvious way a price-setter acts
in bad faithCby treating similarly-situated buyers differently. 

                                                                        *
* * *

Courts that have addressed the normalcy question have
consistently held that a lack of subjective good faith takes a challenge
outside the bounds of what is normal.  Id.

Like the plaintiffs [in these other cases], the
franchisees here are alleging a breach of good faith grounded not in Exxon=s failure to price in accord with an established
schedule, but in its failure to set the price in good faith.  Suits recognizing such a cause of action are
rare, and with good reason: We would be ill-advised to consider a case to be
outside the norm based only on an allegation of improper motive by the party
setting the price.  

Plaintiffs produced enough evidence to escape comment
3’s “normal case” limitation.  They
showed, for example, that Exxon planned to replace a member of its franchises
with CORS [company owned stations], that the DTW price was higher than the sum
of the rack price and transportation, that Exxon prevented the franchisees from
purchasing gas from jobbers after 1994, and that a number of franchisees were
unprofitable or non-competitive.

 

Id. at 457B458 (footnotes and citations
omitted).

We agree with the Mathis court’s conclusions, and
agree that its conclusions are consistent with those of other courts that the
good faith requirement of section 2.305 involves fact findings that are not
appropriate for summary judgment.  See,
e.g., Nanakuli Paving and Rock Co. v. Shell Oil Co., 664 F.2d 772, 805B06 (9th Cir. 1981); Allapattah,
61 F. Supp. 2d at 1325; Wilson v. Amerada Hess Corp., 773 A.2d 1121,
1130B31 (N.J. 2001); E.S. Bills, Inc.
v. Tzucanow, 700 P.2d 1280, 1286 (Cal. 1985). 








Therefore, we reject Shell=s contention that section 2.305
applies only to discriminatory pricing claims, and hold that the good faith
requirement of section 2.305(2) of the Code imposes on merchants both
subjective good faithChonesty-in-factCand objective good faithCobservance
of reasonable commercial standards of fair dealing in the trade.  Additionally, a merchant satisfies the good
faith requirement in the “normal case” of a fixed price so long as the merchant
exercises honesty-in-fact in setting the price.

As the Mathis court stated, however, a case must
involve more than mere allegations of improper motive to take a claim outside
the normal case.  Mathis, 302 F.3d
at 457; see also Wilson, 773 A.2d at 1130 (stating that “an allegation
of bad faith or unfair dealing should not be permitted to be advanced in the
abstract and absent improper motive”). 
As noted, the Mathis franchisees presented evidence that Exxon
planned to replace a number of its franchises with company-owned stations, that
the DTW price was higher than the sum of the rack price and transportation,
that Exxon prevented the franchisees from purchasing gas from jobbers, and that
a number of franchisees were unprofitable or non-competitive.  See Mathis, 302 F.3d at 457B58. 
This evidence was sufficient to take the case out of comment 3=s “normal case” limitation.  Id. at 457.

Here, the dealers have produced similar evidence in support
of their claims.[8]  Among other things, the dealers presented
evidence that (1) 73B80% of their Houston competition paid rack priceCor lowerCfor gas while they paid Shell=s significantly higher DTW price, (2)
the dealers were “captive buyers” required to purchase Shell-branded gas at
Shell=s price, and (3) Shell=s DTW price was often higher than
competitor=s prices.  The dealers presented evidence that their gas
sales have been decreasing and their businesses have been declining over the
past several years, that they have lost money, and that some have gone out of
business.  The dealers also pointed to evidence
that, unbeknownst to them, Shell intended to reduce the number of dealer
stations while increasing the number of company- or contractor-owned
stations.  This evidence, they contend,
supports an assertion that Shell intended to eliminate the dealers in order to
replace them with more profitable operations.[9]  








Viewing the evidence in the light most favorable to the
dealers, we agree that they have presented sufficient evidence to raise a fact
issue regarding whether Shell set its DTW prices in good faith.  Therefore, the trial court erred in granting
summary judgment on the dealers= pricing claim.  Our resolution
of this issue renders it unnecessary to address the dealers’ contention in
their fourth issue that they were denied continuances to obtain additional
discovery.  We are confident that any
discovery disputes arising after remand will be addressed by the trial court in
a manner consistent with our holding. 

3.         The Releases








In their third issue, the dealers contend the trial court
erred in granting Shell summary judgment against a number of dealers that had
executed releases in favor of Shell when they sold their stations to Shell or
others.[10]  Twenty-seven of the dealers appealed, arguing
the releases are unenforceable on the grounds of economic duress.  In the dealers= affidavits in support of their
economic duress claim, they stated that they were forced to sell their stations
because they became financially unviable. 
They also stated that they bought gas from Shell at prices higher than
their competitors’ retail prices, and that consequently, their gas sales volume
decreased, leading to lower profits and financial problems.  Because the dealers could not afford to
abandon their businesses, they contend, they were forced to sell them to Shell
or to other dealers and to sign the releases because of economic duress.

Duress is an affirmative defense in confession and avoidance
of the affirmative defense of release.  Brown
v. Cain Chem., Inc., 837 S.W.2d 239, 242B43 (Tex. App.CHouston [1st Dist.] 1992, writ
denied).  Once Shell conclusively
established the elements of its affirmative defense of release, the burden
shifted to the dealers to raise a genuine issue of material fact on
duress.  Id. at 243; Spring
Branch Bank v. Mengden, 628 S.W.2d 130, 135 (Tex. App.CHouston [14th Dist.] 1981, writ ref=d n.r.e.).  There can be no duress without the
following:  (1) a threat or action taken
without legal justification; (2) the action or threat was of such a character
as to destroy the other party's free agency; (3) the threat or action overcame
the opposing party=s free will and caused it to do that which it would not
otherwise have done and that which it was not legally bound to do; (4) the
restraint was imminent; and (5) the opposing party had no present means of
protection.  Chapman Children=s Trust v. Porter & Hedges,
L.L.P., 32
S.W.3d 429, 443 (Tex. App.CHouston [14th Dist.] 2000, pet. denied).  Furthermore, economic duress may be claimed
only when the party against whom it is claimed was responsible for the claimant=s financial distress.  Dear Creek Ltd. v. N. Am. Mortgage
Co., 792 S.W.2d 198, 203 (Tex. App.CDallas 1990, no writ).

Here, the dealers= affidavits, all generally the same,
state that Shell=s actions left the dealers to either face bankruptcy or to
sell or close their businesses, and that Shell “demanded” that they sign a
release before it would approve any sale. 
Additionally, the dealers stated that they were “forced” into signing
the releases because they “could not afford to lose everything,” and felt they
were “coerced to do so or face financial ruin.” 









We find these affidavits to be conclusory and ineffective to
prevent the entry of a summary judgment. 
See Burrows v. Arce, 997 S.W.2d 229, 235B36 (Tex. 1999); In Re Am. Home
Prods. Corp., 985 S.W.2d 68, 74 (Tex. 1998).  Even assuming Shell set the DTW prices with
the intention of driving the dealers out of business, the dealers= statements do not satisfy all the
elements of economic duress.  The dealers
identify no facts in either their affidavits or the record to show that
financial ruin was imminent or that they had no present means of
protection.  See Deer Creek, 792
S.W.2d at 203 (holding release not invalid in absence of evidence supporting
elements of economic duress).  The affidavits
fail to give the court sufficient facts to make an independent evaluation of
whether their situation met the five elements of economic duress.  In addition, we note that the dealers direct
us to no cases in which a claim of economic duress has succeeded at all, much
less one that succeeded in a similar circumstance. 

Therefore, we overrule the dealers= third issue and uphold the trial
court=s grant of summary judgment in favor
of Shell against the dealers who executed releases for particular stations, and
whose claims related to those stations, on the ground of release.  

4.         The Dismissal
of Eight Dealers for Failure to Respond to Discovery 

In their fifth issue, the dealers contend that the trial
court abused its discretion in dismissing eight dealers= claims with prejudice for failing to
fully and timely respond to discovery. 
The dealers argue that dismissal with prejudice was an excessive and
improper sanction, especially before the end of the discovery period.  The dealers also contend that the trial court
applied a double standard because it required full compliance with Shell=s discovery requests while not
requiring full compliance with the dealers= discovery requests.

a.         The
Applicable Dates and Deadlines








Shell served its first request for production of documents on
December 15, 1999, and a revised first set of written interrogatories on May
19, 2000.  On June 16, 2000, the trial
court signed an agreed order on a rolling discovery plan, requiring the dealers
to respond to the first three subsections of Shell=s interrogatory number 1 by June 19,
and to answer the remaining interrogatories and to produce responsive documents
not already produce d at a rate of 75 dealers per week beginning on June
26.  Responses to the interrogatories for
all dealers were to be completed and all responsive documents were to be
produced no later than August 21, 2000. 
When some dealers failed to produce documents in response to the rolling
discovery plan, Shell filed a motion to compel. 
On July 24, 2000, the trial court ordered the dealers to respond fully
to Shell=s requests for production, and
additionally ordered certain plaintiffs to produce certain categories of
documents by August 1, 2000.

On August 22, one day after the court-ordered deadline for
the dealers to complete their discovery responses, Shell filed a motion to
dismiss the claims of those dealers that had completely failed to respond to
Shell=s requests for production and
interrogatories, and to compel interrogatory responses and depositions from
other dealers.  In response, the dealers
requested that those who had partially responded to either Shell=s first request for production or its
revised first set of interrogatories be given additional time to respond before
dismissal.  They also requested that
those who wholly failed to comply with Shell=s discovery requests be permitted to
nonsuit their claims without prejudice. 
At a hearing on August 28, the trial court ordered the dealers to
provide all requested documents and interrogatory answers by September 7, and
further indicated that he would dismiss those who did not comply by that
date.  








On September 11, the trial court ordered approximately 200
dealers dismissed with prejudice for failing to respond to discovery.  Thereafter, thirty-three dealers filed eight
separate motions to reinstate.  The trial
court reinstated all but eight dealers. 
These dealers moved for reinstatement on the basis that they had since
answered the discovery.[11]  However, the record contains no evidence of
the discovery that was presumably produced, or any indication that any
subsequent production would have satisfied the trial court=s earlier orders.  And, in any event, the dealers offer no
explanation for their failure to comply with the trial court=s orders prior to dismissal.  The dealers do not contend that any dealers
were dismissed in error because they fully complied with the trial court=s orders prior to dismissal.[12]

b.         The Law
Governing Death Penalty Sanctions

Texas Rule of Civil Procedure 215.2(b) provides that “[i]f a
party … fails to comply with proper discovery requests or to obey an order to
provide or permit discovery … the court in which the action is pending may,
after notice and hearing, make such orders in regard to the failure as are
just,” including “an order … dismissing with or without prejudice the action or
proceedings or any part thereof.” Tex. R.
Civ. P. 215.2(b)(5).  In Transamerican
Natural Gas Corp. v. Powell, the Texas Supreme Court set out the standards
for determining whether an imposition of sanctions is just for purposes of Rule
215.2.  811 S.W.2d 913, 917B18 (Tex. 1991).  First, a direct relationship must exist
between the offensive conduct and the sanction imposed, meaning that the
sanction must be directed against the abuse and toward remedying the prejudice
to the injured party.  Id. at
917.   This also means that the sanction
should be visited upon the offender, meaning that the trial court must attempt
to determine whether the offensive conduct is attributable to counsel, the
party, or both.  Id.  Second, the sanctions must not be
excessive.  Id.  In this regard, “courts must consider the
availability of less stringent sanctions and whether such lesser sanctions
would fully promote compliance.”  Id.









Although imposing a death penalty sanction creates a concern
because a court thereby renders judgment with complete disregard for the merits
of the case, Hamill v. Level, 917 S.W.2d 15, 16 (Tex. 1996), if a party
refuses to produce material evidenceCin spite of lesser sanctionsCthe court may presume that an
asserted claim or defense lacks merit and dispose of it. Transamerican,
811 S.W.2d at 918.  We review the trial
court=s dismissal order for abuse of
discretion.  Id. at 917.

c.         Death
Penalty Sanctions Were Appropriate

Here, the trial court=s second discovery order included a
lesser sanction in the form of a warning that non-compliance would result in
dismissal.  See Andras v. Mem=l Hosp. Sys., 888 S.W.2d 567, 572 (Tex. App.CHouston [1st Dist.] 1994, writ
denied).  The dealers failed to timely
produce responsive documents or answers to interrogatories despite the trial
court=s two earlier orders to produce.  The dealers also never gave an explanation
for their failure to produce the discovery. 
The discovery Shell sought was material to the dealers= allegations and alleged damages, and
the failure to provide it would have impacted Shell=s ability to prepare for trial on
those dealers= claims.  Given these facts, the trial court could have
determined that the dealers= claims lacked merit.  See
Transamerican, 811 S.W.2d at 918; see also In re Zenergy, Inc., 968
S.W.2d 1, 11 (Tex. App.CCorpus Christi 1997, no pet.) (“Without such documentation
[of plaintiffs’ damages], the trial court was left with no other conclusion
than that the case lacked merit.”).  We
cannot say that, on this record, the trial court abused its discretion in
dismissing the claims of those dealers with prejudice.  

Therefore, we overrule the dealers= fifth issue, and sustain the trial
court=s dismissal of the eight dealers for
failure to comply with discovery orders.

5.         The Omission
of Certain Dealers from the Last Live Pleading








In response to the dealers= issues, Shell argues that certain of
the dealers and their stations were omitted from the tenth amended petition,
the last live pleading; therefore, their claims were effectively dismissed from
the suit.  See Tex. R. Civ. P. 65; Mercure Co. v.
Rowland, 715 S.W.2d 677, 679 (Tex. App.CHouston [1st Dist.] 1986, writ ref=d n.r.e.).  Moreover, Shell contends that the deletion of
those dealers and stations after the trial court=s ruling on the first motion for
summary judgment waives any complaint on appeal.  See Randolph v. Jackson Walker L.L.P.,
29 S.W.3d 271, 275 (Tex. App.CHouston [14th Dist.] 2000, pet. denied); Radelow-Gittens
Real Prop. Mgmt. v. Pamex Foods, 735 S.W.2d 558, 560 (Tex. App.CDallas 1987, writ ref’d
n.r.e.).  

The dealers respond that Shell is mistaken regarding five of the
dealers and stations because they were in fact named in the tenth amended
petition, and five others were reinstated after the tenth amended petition was
filed.  As to the rest, the dealers
contend all of them were dismissed on the grounds that they signed releases or
failed to timely produce discovery, and the general pleading rules should not
apply because their omission was inadvertent. 
See American Petrofina, Inc. v. Allen, 887 S.W.2d 829, 830B31 (Tex. 1994).  

We hold that all dealers and stations actually named in the
tenth amended petition, and those that were reinstated after the tenth amended
petition was filed, are parties to this appeal. 
As to the remaining dealers and stations, however, we have sustained the
trial court=s rulings on Shell=s affirmative defense of release and
its refusal to reinstate certain dealers and stations whose claims were
dismissed for failing to timely respond to discovery.  Therefore, we need not determine whether the
omission of those dealers and stations was inadvertent, because they were
properly dismissed on other grounds.  

IV.       CONCLUSION

In summary, we reverse the trial court=s judgment dismissing the dealers= claim that Shell breached the good
faith requirement of section 2.305 of the Code in setting the DTW price and
remand for further proceedings in accordance with this opinion.  Because of our resolution of this issue, we
do not reach the dealers= complaint that they were denied continuances to obtain
additional discovery before the summary judgment hearings.  We 








affirm that portion of the trial court=s judgment dismissing the claims of
those dealers and stations on the grounds of release and failure to respond to
discovery orders. 

 

/s/        Wanda McKee Fowler

Justice

 

 

 

Judgment rendered
and Opinion filed February 13, 2003.

Panel consists of
Justices Hudson, Fowler, and Duggan.[13]




APPENDIX
A

 








HRN, Inc., Abuzaid, Maged (Abuzaid, Inc.); Adams,
Thomas (Goff Enterprises, Inc.); Adams, Ken (Fireball, Inc.); Afshari, Iradj
(Caspian Petroleum Co.); Akshar, Ghanem (Houda, Inc., Boushra, Inc., Askam,
Inc.); Al-Hakim, Munadhil (Al-Hakim Corp., Farmington Express, Inc.); Alshawwa, Samih (Samih Alshawwa); Ambroziak, Mark (Five-M Enterprises, Inc.); Ancker, Larry (Red Eagle, Inc., Ancker
Eagle, Inc., Colonial Eagle, Inc.); Anderson, John (John Anderson); Argyriou, Nick (N.S.A. Enterprises, Inc.); Ashodian, Richard (Ricmar, Inc.);
Askar, Bassam (Starco Management Co., Inc.); Audette,
Robert (Bob Audette, Inc.); Badreshia,
Parshotam (Parshotam Badreshia); Baghdadi, Syed (Syed L. Baghdadi); Bahouth, Samir (Bahouth, Inc.); Balhan, Maurice (Balhan
Enterprises, Inc.); Balloutine, Fouad
(Balloutine & Sons, Inc.); Bautista, Rudy
(R&L, Inc.); Behrang, Mohammed (Behrang, Mohammed M.); Benaksas,
Daniel (The Pro Odos Corp.); Berkey,
Jr., Calvin (Calvin Berkey Enterprises, Inc.); Berkey, Sr., Calvin (C&B Car Wash, Inc.); Berry, Abdel (Berry Shell, Inc.); Beyer, Edward (Beyer, Inc.);
Beyer, Mark (MB Enterprises, Inc., Beyer Enterprises, Inc.); Bitetzakis, John (Woodhaven Shell, Inc., Tarpon Mart, Inc.,
Bay, Inc., Northern Gasoline Corporation); Bond, Roy (Roy L. Bond, Inc); Boschert, Daniel (Spebo Oil Co.,
Inc., Daniel S. Boschert, Inc.); Bouzeid,
Abdul (Abdul Bouzeid); Braley,
Douglas (KRS, Inc., State Street Food Mart, Inc.); Brammer,
Marge (M. Brammer, Inc.); Bruce, Horace (Bruco, Inc.); Brus, Jr., Michael
(Mike=s Shell Service of Sayreville); Bucalo,
Jeffrey (New Five Shell, Inc.); Buchanan, Buck (Alatex,
Inc.); Burton, Rae (Rae Burton); Butzlaff, Robert
(Plaza Shell, Inc.); Carlson, Duane (Carlson Oil, Inc.); Cavanaugh, Mitchell
(Tri-C Enterprises, Cavanaugh, Inc., Arlington & Gold, Inc.); Ceriello, Victor (NOS Corp., COS Corp., CVI Corp.); Ceylan, Thomas (Thomas Ceylan); Chamchyan, Nektar (A.A.P. Corp.);
Chang, Kyung (Kyung Chang); Charania, Nasiruddin (Ekram & Nasir Corporation); Chawla, Mary
(Mille Fleurs, Inc.); Clausen, David (Dave=s Fanwood Shell, Inc.); Coppedge,
Everett (Everett Coppedge); Corso,
Lloyd (Either-Orr, Inc.); Cumming, Mark (Moday,
Inc.); Cutsinger, Richard (Petro
Station Holdings, Ltd.); Dalou, Bashar
(Dallous International, Inc.); Dalou,
Ammar (S&A Mart, Inc.); Daoud,
Ziad Steve (Zoo-Zoo Brothers, Inc.); DeLizio, Bill (Bill DeLizio);
Deluca, Ronald (S&S Shell, Inc.); Dennig, Raymond
(Raymond Dennig); Deriss, Najef (Najef Deriss
& Saied Hamidi); Deter,
Robert (Robert Deter); Detterman, Joe (JCD, Inc.); Dhanani, Shoukat (Amin Enterprises, Inc., D&D International, Inc.,
S&A Oil Company, Inc.); Diaz, Carlos (Carlos Diaz); Dietz, Sr., James
(J&J Shell Food Mart, LLC); DiGiacomo, Daniel (Daniella Manufacturing, Inc.); Diguiseppi,
Stanley (Pancoast & Small, Inc.); Dikmen, Dursun (Dikmen, Dursun; Dikmen Enterprises, Inc.); Dimakopoulos,
Laura (A-L Ventures, Inc.); Domingo, Carlos (Carlos Domingo); Dominguez, David
(Alexa Corp.); Donohue, Timothy (Donohue Enterprises,
Inc.); Dotto, Randall (70 Doc Corp.); Dula, John (John Dula); Dula, Donald (J&D Dula,
Inc.); Ebrahim, Sami N.
(Modern Pyramid, Inc.); Economides, Gus (Economides, Inc.); Egan, Harold, (Egan
Enterprises, Inc., Harold Egan); Eiserloh, Joseph
(Joseph R. Eiserloh); Elanges,
Dean (M&M Elanges, Inc.); Elmalki,
Osama (Inland Pacific Petroleum, Inc.); Ezanidis, Georgios (Ezanidis Brothers Enterprises, Inc.); Ezanidis,
A. (Ezanidis Enterprises, Inc.); Fadakar,
Farshid (Farshid Fadakar & Shahram ASean@ Zarrinkouh); Farhat, Houssen (Houssen Farhat); Farias, Enrique (Henry=s Shell
Stations, Inc.); Fein, Jim (J&D Fein Enterprises, Inc.); Feury, Sieg (L.P. Shell, Inc.);
Fischer, Ernest & Paula (E&P Enterprise, Inc., E&P Enterprise, Inc.
III); Florentis, Maria (Intershell,
Inc.); Fodor, David (David E. & Marie A. Fodor); Francisco, German (North
Bergen, Inc.); Francisco, Jr., Celestino (C&C
Francisco Shell, Inc.); Francisco-Sosa, Maura (Octagon Shell, Inc.); Frantzeskakis, Nick (Fondren
Service, Inc.); Fratturo, Frank (FLK Enterprises,
LLC); Frederick, William (WRF Enterprises); Frisch, James (Frisch Enterprises,
Inc.); Fullington, Keith (Keith Fullington);
Gadsden, Marshall (Gadsden Enterprises, Inc.); Garoyan,
Hagop (Rt. 23 Shell, Inc.); Getta,
John (L&S Auto Care, Inc.); Giannopoulos, Diamandi
(Diamandi Giannopoulos); Gmeiner,
Thomas (Bridgeview Car Wash, Inc.); Gorman, Glen (Tinley Park Shell, Inc., Glen
Gorman); Griffith, Arthur (A.D. Griffith, Inc.); Grivon,
Michael (River Oaks Car Care Center, Inc., Many Pines Shell, L.L.C., West Loop
Shell, L.L.C., Woodlands Shell, L.L.C.); Gruppuso,
Dominick (Central Avenue Shell Corp.); Guenther, Carolyn (Garnerville Shell,
Inc.); Guleria, Manjit
(MSSG Associates, Inc.); Guzel, Huseyin
(Stelton Service Station, Inc.); Habhab,
Al (Eleven & Lahser Service, Inc.); Habhab, Habib (Grand River &
Power Shell); Habhab, Hussein (Sam=s Shell, Inc.); Habhab, Ghaleb (New H&H Corporation); Hackett, Martin (Martin
Hackett, M.H.H. Ltd.); Hadid, Safaa
(Orchard 10 Miles Service, Inc.); Hanna, Sherif (Sherif Auto Care, Inc.); Harajli,
Nabil (H2Oil, Inc.); Harajly,
James (James Service Station); Harb, Hassan (Green 8 Mile, Inc.); Harp, Aly
(I-94 Shell, Inc.); Harp, Hassen (Fellows Creek
Shell, Inc., Hassen Harp); Harp, Aly
(Boulevard Shell, Inc.); Harris, Charles (Harris Big Hill Shell, Inc.); Havlena, Raymond (Havlena=s Serv. Ctr., Inc.); Heinemann, Jeffrey (Enterprises
by Heinemann); Hill, David (David Hill for Island Shell, Inc.); Hoang, Anh (Hoang Food Mart, Inc.); Hoerath;
Arthur (Westerville Self Service, Inc.); Hooda, Jack
(Hooda Corporation, Inc.); Howard, Gerald (Oradell
Auto Care, Inc.); Hrydziuszko, Ron (Ron Hrydziuszko); Huber, Jim (E&H Automotive, Inc.);
Hudson, Frank (17 and Rochester Shell, Inc.); Hunter, Warren (Hunter-Doan,
Inc.); Huntzicker, Dan (Dan Huntzicker);
Hyder, Msalim (Sonia &
Anil Corp., Inc.); Issa, Amila
(Rahim, Inc.); Jackson, Elvis (Elvis Jackson);
Jacobs, David (Jacor Enterprises, Inc.); Jamshedji, Aspy (Ahura Corporation); Janokowicz,
Walter (Lockport Oil Corporation f/k/a West Suburban Oil Corp.); Jivani, Inayat (Aslam & ASIF International, Inc., Tausif
International, Inc.); Johnston, Bruce (BVJ, Inc.); Joyce, Donald (Do Gas Shell,
Inc.); Kantar, Riad (The Haneen
Corporation); Karaali, Alper
(Karaali Corp.); Karimi, Seyed (Seyed Karimi);
Katopodis, Danny (Judan,
Inc.); Kazilas, Fivos (Fivos Kazilas); Keaton, Roger (RMK Enterprises Illinois, Inc., Roger Keaton); Keith, Douglas (Douglas Keith); Kennedy, Peter
(Taconic Shell, Inc.); Kenney, Thomas (Betran, Inc.);
Kernan, Lola (Jim=s Clearview Shell, Inc.); Khalaf, Khalaf (Khalaf Khalaf); Khaleq, Hassan (Hassan A. Khaleq); Khaleq, Hakam (Hakam Abdel
Khaleq); Khaleq, Muhsen David (Muhsen David Khaleq); Khaliq, Ishan Abdel (Abuzaid Petroleum,
Inc.); Khordaji, Abbott (AAK Investments, Inc.,
Blalock Services Center, Inc.); Khordaji, Adam
(Telco, Inc.); Kiger, Dion
(Kiger Enterprises, Inc.); Kilic,
Kenan (Kenan Kilic); Kim, Don (Don Kim); Kim, Suk
Am (Suk Am Kim); Kirkland, John (John Kirkland); Kirschner, Tony (Northshore Shell Car Wash, Inc.); Klass, William (B&C Auto Service, Inc.); Koborsi, Hanna (Kasro, Inc.); Koumoulos, Steve (Ella Services, Inc., Harwin
Services, Inc.); Kumbalasiri, Preda
(S.K.P., Inc.); Kummer, Theodore (Theodore B. Kummer); Kurter, Sami (Norwood Gas & Co., Inc., Sami
Kurter); Kyle, Sr., John (North Shore Shell, Inc.); LaManna, Jr., Ernest (Ernest LaManna,
Jr.); Lambton, Kenneth (Lambton=s Service, Inc.); Langone,
John (John Langone and Tony Dimango);
Larsen, Steven (Larsen=s 37, Inc.); LaVigne,
Kenneth (LaVigne Services, Inc., K.C. LaVigne, Inc.); LaVigne, Jr.,
Terry (T&R Auto Service Corp.); Le-Nguyen, Jodi (Nguyen Oil Company, Inc.);
Ledbetter, Mark (Mark Ledbetter); Lerdsuwanrut, Saksit (Lerdsuwanrut, Saksit); Lesniak, Laura (Tal/Cum Shell Service); Leverenz,
Edward (Interstate Shell Inc.); Livengood, Delbert
(Deceased) (Livengood, Inc.); Louras,
Peter (Greenwood Central, Inc.); Mackenzie, Hugh (Fairfield Brake and Wheel,
Inc.); Malinsky, Peter (Minsky
Enterprises, Inc.); Malke, Joseph (Teaneck Shell,
Inc.); Manjikian, Abraham (Eastway,
Inc.); Marshall, Robert (Bob Marshall Enterprises, Inc.); Martini, Charles
(Cherry Tree Holding, Inc.); Marx, Darrell (12 & Halstead Rd. Service
Center, Inc., Marx Auto Car Centers, Inc.); Mauro, Dale (Bricom,
Inc.); McGroarty, Michael (Michael H. McGroarty, Inc.); Melchiorre,
Michael (Michael A. Melchiorre, Inc.); Messick, James (Messick
Enterprises, Inc.); Mirgorodsky, Gennady (Dagen, Inc.); Mirza, Michael
(Michael Mirza); Mousa,
Rashid (Echo Enterprises, Inc.); Moustakis, Dionyssios (Dionyssios Moustakis); Mullins, Hugh (Hugh Mullins); Nabi, Ihtsham (Ihtsham Nabi & Nazma Nabi); Nalu,
William (Nalu Enterprises, Inc.); Nasser, Moses
(Moses & Marlene Nasser); Nehme, Adib (Adib Nehme);
Nemry, Naim (Nemry, Inc., Nemry, Naim A.); Neumayer, Charles (Wil-Ridge Shell Service, Inc.); Nguyen, Tiffany (Trinh
Enterprises, Inc.); Nguyen, Chris-Thuong (Thuong Services, Inc., Tiffany Nguyen, Inc.); Novak, Carl
(Novak=s Shell, L.L.C.); O=Brien,
Ralph (R.O.B. Enterprises, Inc.); O=Connell,
Thomas (Bay Pointe Auto Wash, Inc., Orchard/14 Car Wash, Inc.); O=Neill, Douglas (MPS Enterprises, Inc.); O=Rourke, James (O=Rourke
Enterprises, Inc.); Onassis, Christos
(Christos Onassis); Orban, John (Orban Food Mart,
Inc.); Orr, John (Either-Orr, Inc.); Oyster, M.R. (M.R. Oyster, Inc.); Paglini, Joseph (Greenwood Service Center); Palmer, Michael
(Michael Palmer); Papavasiliou, Theofilos
(Theofilos Papavasiliou); Parrett, Tom (Tom Parrett);
Patel, Jay Prakash (Natraj,
Inc.); Patel, Kirit (C. Mani
Corp., Inc.); Patel, Jayesh (Jayesh,
Inc.); Patel, Arvind (Arvind,
Inc.); Patel, Vasudev (Vasudev
Patel); Pavka, Jim (Jim Pavka);
Peacock, Kenneth (JP Enterprises, Inc.); Pearson, Mark (Mark Pearson); Peffer, Leonard (L.E.P., Inc.); Perezous,
George (Westbury Shell, Inc.); Perlman, Michael (7505
Spencer, Inc.); Petrino, Mark (Mark R. Petrino); Platis, John (John Platis); Platke, Ronald (Ronald Platke); Poonawala, Shiraz (SYP
Enterprises, Inc.); Porter, Brian (Multi-Service Ctr. Shell, Inc.); Price, John
(John Price for John Price, Inc.); Priest, Don (Don Priest); Prior, Keith
(Westfield Food Mart, Inc.); Ptasznik, Gary (Gary Ptasznik); Radwan, Ahmed (Lucky
Oil Company, Inc., Inland Pacific Petroleum, Inc.); Raftery,
William (I.A.T., Inc.); Ramin, Mehrdad
(Mehrdad Ramin & Mehri Ramin); Rasha,
Najeb (Rasha & Son,
Inc.); Rasool, Mustafa (MAT Enterprises, Inc.); Rast, Michael (Michael Rast); Ratonel, Lorna (Lorna B. Ratonel
Enterprises, Inc.); Rauth, Jr., Frank (Frank E. Rauth, Jr.); Reed, William (William & Carol S. Reed,
Reedy Oil); Reeves, Jack (Jack Reeves Trucking, Inc.); Rickenbacker,
John (John Rickenbacker); Robson, W.G. (Dublin Sohio, Inc.); Rossini, Sr., Robert (Q.L.S. Corporation); Roumantzas, Spiros (Spirantzas, Inc.); Saadi, Nabil (Sand, Inc.); Samani, Peter
(Aramson, Inc.); Samarneh, Monther (Monther Samarneh); Samuels, David (David A. Samuels); Sandhu, Pavittar (Sandhu Service, Inc., Palmyra Gas & Food, Inc., PS
Shell, Inc.); Schladt, Anna (Mike Anna, Inc. f/k/a
Golf-Mil Shell, Inc.); Schlitt, Don ( Don E. Schlitt, Inc.); Schocker, William
(William Schocker); Scieneaux,
Herman (Gentilly Service, Inc.); Senawi,
Janan (Dounia Enterprises,
Inc., Senawi Enterprises, Inc., David=s Enterprises, Inc.); Sfondeles,
George (Majestic Union 76 Corp.); Shabaneh, Sameh (Shabaneh, Sameh); Shaya, Salah (Shaya, Inc.); Shea, Dan (Dan Shea); Shriner, James (Broad & James, Inc.); Shtayyeh, Hish (Landen Food Mart, Inc.); Shumlak,
Moseh (Moshe, Inc.); Siha,
Samuel (St. Mina K, Inc.); Sirchio, Bruce (G.I.O.,
Inc.); Skruba, Charles (C. Skruba,
Inc.); Snono, Maykel (Snono Shell, Inc.); Sooy, Richard
(Sooy, Inc.); Spangler, Buck (Reynoldsburg Center
Shell, Inc.); Speed, Ed (Walnut Hill Enterprises, Inc.); Steinbrunner,
Jack (Jack Steinbrunner); Stevens, Joe (Busse Woods Shell, Inc.); Stevenson, Jerry (Main and McNaughten, Inc.); Stewart, Jerry (Jerry K. Stewart, Inc.);
Stohrer, Robert (Stohrer
Brothers, Inc.); Stohrer, Sr., D. G. (Wall Shell
Service, Inc.); Sturm, William (Milwaukee Ballard Service, Inc.); Summers,
Leonard (Grand Island Shell, Inc.); Syal, Krishana (K&V Services); Talib,
Peggy (SAMPS, L.L.P.); Tarbel, Christopher (Tarmart, Inc.); Tessema, Teshome (Teshome Shell, Inc.); Tidemann, David (Lott=s
Service, Inc.); Trabbie, James (James Trabbie); Treacy, Richard
(Landing Gas Services); Turnberian, Abraham (Abraham Turnberian); Uguccioni, Thaddeus
(Double-U Enterprises); Uguccioni, Howard (Service
Station Management, Inc.); Varcados, Jack (Jack John Varcados Shell, Inc.); Varcados,
Anthony (Varcados Brothers Shell); Velasco, Ricardo
(Ricardo A. Velasco); Verdesco, Sergio (Verdesco, Sergio); Virani, Feroz (F&J, Inc.); Vo, Hung (Vo, Hung, Hung Vo
Enterprises, Inc.); Volpini, Charles (Volpini & Sons, L.L.C.); Watkins, Willie (Watkins
Shell, Inc., W.E. Watkins, Inc., Willie Watkins); Weekley,
Beverly (Beverly Weekley); Weissmann,
Joseph (Joseph Weissmann, Inc., Terra Cotta, Inc.);
Wilson, Paul (Fairview Auto Care, Inc.); Yehia,
Hussein (HYZ Enterprises, Inc., Worldwide 2000, Inc., Shelco,
Inc.); Yildirim, Eyup (Sakarlar Enterprises, Inc.); Young, Thomas (Thomas Young);
Young, Timothy (Thomas Young Corp.); Zarrinkouh, Shahram (Sean) (Shahram Zarrinkouh); Zebis, Tom (Zebis Enterprises, Inc.); Zqaihi,
Tawfig (T&H Enterprises, Inc.). 

 

 











[1]   A list of the
appellants is contained in Appendix A.





[2]  The jobber
contract provides that if a jobber sells Shell-branded gasoline to a station
that is in competition with a station served directly by Shell, then the jobber
will be charged DTW for such gasoline rather than JTP.





[3]  The full text
of section 2.305 is as follows:  

 

(a)        The parties if they so intend can conclude a contract for
sale even though the price is not settled. 
In such a case the price is a reasonable price at the time for delivery
if

 

(1)        nothing is said as to price; or

(2)        the price is left to be agreed by the parties and they fail
to agree; or

(3)        the price is to be fixed in terms of some agreed market or
other standard as set or recorded by a third person or agency and it is not so
set or recorded.

 

(b)        A price to be fixed by the seller or by the buyer means a
price for him to fix in good faith.

 

(c)        When a price left to be fixed otherwise than by agreement of
the parties fails to be fixed through fault of one party the other may at his
option treat the contract as cancelled or himself fix a reasonable price.

 

(d)        Where, however, the parties intend not to be bound unless the
price be fixed or agreed and it is not fixed or agreed there is no contract.  In such a case the buyer must return any
goods already received or if unable so to do must pay their reasonable value at
the time of delivery and the seller must return any portion of the price paid
on account.

 

Tex. Bus. &
Com. Code Ann. ' 2.305.





[4]  The Texas UCC
defines Amerchant@ as

 

a person who deals in goods of the kind or otherwise
by his occupation holds himself out as having knowledge or skill peculiar to
the practices or goods involved in the transaction or to whom such knowledge or
skill may be attributed by has employment of an agent or broker or other
intermediary who by his occupation holds himself out as having such knowledge
or skill.

 

Tex. Bus. & Com. Code
Ann. '
2.104(a) (Vernon 2002).  





[5]  While the
comments following the code provisions are not law, they are persuasive
authority concerning interpretation of the statutory language.  See Lockhart Sav. & Loan Ass=n v. RepublicBank Austin, 720 S.W.2d 193, 195 (Tex. App._Austin 1986, writ ref=d
n.r.e.).





[6]  The
court focused primarily on sections 1.201(19) and 2.103.  Id. at
453B56.  





[7]  The court
concluded this, in part, because, in defining what Agood faith@ means,
the comment states that it Aincludes@
observance of reasonable commercial standards of air dealing.  By using the word Aincludes@ the
framers were implying that objective good faith was not the only component of
good faith.





[8]  Indeed,
the dealers employ the same expert used by the Mathis franchisees, Barry
Pulliam, to support their allegations that Shell=s
DTW price exceed the rack price plus costs and that its pricing was
uncompetitive.  See Mathis, 302
F.3d at 460B61.





[9]  The evidence
is not addressed in greater detail because much of it was filed under seal.





[10]  Depending on
the circumstances, the dealers executed documents containing either of the
following provisions:

 

2.         Release

 

Shell and Dealer hereby respectively release each
other _ from all claims and demands which each now has
against the other (whether or not now known to either) arising directly or
indirectly out of or in connection with each terminated agreement and
relationship specified above, or any consignments, sales or deliveries of motor
fuels and other products by Shell to Dealer, excepting, however, claims of
Shell against Dealer for indebtedness, reimbursement or indemnification, or relating
to personal property of Shell heretofore or now in Dealer=s possession.

 

10.        Shell
and Assignor hereby release and forever discharge each other _ from any and all claims, obligations and demands
which each now has against the other (whether or not now known by either)
arising directly or indirectly out of or in connection with the Dealer
documents and the franchise or other relationships arising there under or any
sales or deliveries of any products by Shell to Assignor there under or
otherwise, excepting, however, claims of Shell against Assignor for
indebtedness, reimbursement or indemnification, or relating to equipment.

 





[11]  Although the
dealers include Robert Rossini, Sr. as one of the eight dealers seeking
reinstatement on the grounds that the discovery was later produced, his name
does not appear on the motion to reinstate filed September 14, 2000 by the
other seven.  Instead, he appears to have
sought reinstatement in a separate motion, dated September 29, 2000, in
response to the dismissal of his claims based on Shell=s affirmative defense of release.





[12]  The dealers= motion to reinstate contends generally that, since
September 11, 2000, several of the dealers Ahave
responded to [Shell=s] Request for Production available after September
14, 2000.@  However, with
regard to plaintiff Vasudev Patel, one of the eight
dealers seeking reinstatement, the motion states that he had previously served
responses to Shell=s requests for production on August 4, 2000.  The motion also states vaguely that he also
had Apreviously served interrogatory responses.@  However, even
assuming Patel produced all documents 
responsive to Shell=s discovery requests on August 4, he missed the
deadline for compliance with the trial court=s order
to produce all documents by August 1, and there is no indication that Patel
fully or timely produced responses to Shell=s
interrogatories by the trial court=s
September 7, 2000 deadline.  





[13]  The Honorable
Lee Duggan, Jr., Retired Justice, Court of Appeals, First District of Texas at
Houston, participating by assignment.